297 P.3d 1062

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Kevin C. METCALFE, Petitioner/Defendant–Appellant.**

**No. SCWC–30518.**

Supreme Court of Hawai'i.

March 19, 2013.

Summer M.M. Kupau, for petitioner.

Ricky R. Damerville, Hilo, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ.; with ACOBA, J., Dissenting Separately, with whom Circuit Judge SAKAMOTO, Assigned by Reason of Vacancy, joins.

Opinion of the Court by
RECKTENWALD, C.J.

On the night of May 6, 2009, the Hawaiʻi County Police Department received a 911 call from Defendant Kevin C. Metcalfe. Metcalfe stated that he had just fired a 12–gauge shotgun at a burglar on his property:

> I told 'em, 'Get down.' Then he says, 'Ah, [ ] you.' He said somethin'. I don't know, and so I shot a round on the ground. I shot one, you know, away from him.
>
> . . . .
>
> He—he just kinda like came toward me so I shot again, and then he, I don't know, blasted past me, and I[ ] shot again.

210

When a police officer arrived at Metcalfe's house, he discovered the body of Larry Kuahuia on a nearby road. There were no visible injuries to the front of Kuahuia's body, but numerous pellet wounds to the back. Metcalfe was subsequently charged in the Circuit Court of the Third Circuit with Murder in the Second Degree and Carrying or Use of Firearm in the Commission of a Separate Felony.

At trial, the State of Hawai'i introduced a transcript of the 911 call, as well as testimony from a number of witnesses. Those witnesses included a forensic pathologist, Dr. Anthony Manoukian, who testified that in his opinion, Kuahuia died from a shotgun wound to the back fired from a distance of approximately 60 feet. They also included Detective Walter Ah Mow, a firearms instructor who testified about the results of tests he had conducted using Metcalfe's shotgun to determine how widely the pellets from the gun dispersed at various distances. Although Manoukian and Ah Mow testified about their training and expertise in, respectively, forensic pathology and firearms, the circuit court did not find on the record that they were qualified to testify as expert witnesses. As discussed below, it appears that the court had adopted a procedure under which it did not make findings in front of the jury regarding a witness's qualification to provide expert opinion testimony.

Metcalfe's defense counsel did not object to the testimony of the witnesses. Instead, he cross-examined them and elicited testimony that—as he would later contend in his closing argument—suggested that Kuahuia could have been shot at a much closer range.

Metcalfe testified in his own defense. He testified that he shot at Kuahuia in self-defense after Kuahuia had first "crab-walk[ed]" toward him, and then charged at him with an object in his hand. The jury was given instructions regarding, inter alia, self-defense and the opinion testimony elicited at trial. In closing argument, the State asserted that Metcalfe intentionally shot Kuahuia in the back from a distance of at least forty feet after Kuahuia ran past him, and did not act in self-defense. Metcalfe's counsel, however, argued that the evidence

demonstrated that Kuahuia was shot from a close distance as he approached Metcalfe, and that Kuahuia was hit in the back because he turned around at the last moment after Metcalfe fired the first shot into the ground.

The jury found Metcalfe guilty of Manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702, and Carrying or Use of Firearm in the Commission of a Separate Felony, in violation of HRS § 134–21(a). The circuit court entered its Judgment of Conviction and Sentence on March 25, 2010.[1] On appeal, Metcalfe argued, inter alia, that the circuit court erred in failing to properly qualify Dr. Manoukian and Detective Ah Mow as expert witnesses. In its March 30, 2012 memorandum opinion, the Intermediate Court of Appeals affirmed Metcalfe's convictions. *State v. Metcalfe*, No. 30518, —— Hawai'i ——, 2012 WL 1071503 (Haw.App. Mar. 30, 2012).

In his June 23, 2012 application for a writ of certiorari, Metcalfe raises the following questions:

I. Whether the ICA gravely erred in finding no error where the trial court denied [Metcalfe's] motion to dismiss without reviewing the transcripts from the grand jury hearing that resulted in a "no bill" and the subsequent preliminary hearing in which probable cause was found;

II. Whether the ICA gravely erred in determining that the trial court did not plainly err by (1) permitting the testimonies of Dr. Manoukian and Det. Ah Mow where the State failed to qualify them as experts in the field of ballistics in accordance with [Hawai'i Rules of Evidence (HRE)] Rule 702 and (2) substituting the standard expert witness instruction with an "opinion testimony" instruction;

III. Whether the ICA gravely erred in determining that the flawed instruction on self-defense was not prejudicially insufficient, erroneous, inconsistent, or misleading;

IV. Whether the ICA gravely erred in finding that the trial court was not

1. The Honorable Ronald Ibarra presided.

required to instruct the jury on the defense of property where there was substantial evidence to support the defense and the failure to so instruct contributed to [Metcalfe's] conviction;

V. Whether the ICA gravely erred in finding no plain error where the trial court failed to provide a cautionary instruction regarding the prejudicial emphasis on [Metcalfe's] possession/use of medical marijuana; and

VI. Whether the ICA gravely erred in rejecting [Metcalfe's] claims of ineffective assistance of counsel based upon numerous errors and omissions that impaired his defense.

As set forth below, we hold that the circuit court did not abuse its discretion in denying Metcalfe's motion to dismiss the amended complaint. We also hold that the circuit court did not plainly err in allowing the testimony of Dr. Manoukian and Detective Ah Mow and substituting the words "opinion testimony" for the word "expert" in the jury instruction. In addition, the circuit court did not plainly err in instructing the jury on self-defense, in failing to sua sponte instruct the jury on defense of property, or in failing to provide a cautionary instruction on the use of medical marijuana. Finally, we hold that Metcalfe failed to establish that his trial counsel was ineffective.

Accordingly, we affirm the ICA's April 24, 2012 judgment on appeal.

## I. Background

The following factual background is taken from the record on appeal.

**2.** HRS § 707–701.5(1) (1993) provides in relevant part, "Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." Metcalfe was ultimately convicted of Manslaughter, pursuant to HRS § 707–702 (Supp.2009), which provides in relevant part, "(1) A person commits the offense of manslaughter if: (a) The person recklessly causes the death of another person; or (b) The person intentionally causes another person to commit suicide."

**3.** HRS § 134–21 (Supp.2009) provides in relevant part:
(a) It shall be unlawful for a person to knowingly carry on the person or have within the

## A. Complaint

On June 8, 2009, the State filed a complaint against Metcalfe, charging him with Murder in the Second Degree in violation of HRS § 707–701.5,[2] and Carrying or Use of Firearm in the Commission of a Separate Felony, in violation of HRS § 134–21.[3] On July 9, 2009, the State filed a nearly identical amended complaint listing the same charges. The amended complaint was dated June 25, 2009.

On December 7, 2009, Metcalfe filed a motion to dismiss the amended complaint based on double jeopardy and collateral estoppel, arguing that the State was barred from filing an amended complaint seeking a probable cause determination from a judge when a grand jury returned a "no bill" on the initial complaint. Metcalfe did not include with his motion the transcripts from the grand jury or preliminary hearing proceedings. Instead, in a Declaration of Counsel attached to Metcalfe's motion to dismiss, defense counsel stated that they "reviewed the case file, court records, and transcripts" and requested that the court "take judicial notice of the said record and transcripts[,]" which counsel believed would show:

a) Prosecutor Frederick Giannini asked a duly constituted grand jury with a proper quorum on June 8, 2009 to return a true bill of indictment against [ ] Metcalfe on two counts against [ ] Metcalfe for the offenses of Murder in the Second Degree ... as amended in count one of said proposed indictment, and in count two of said proposed indictment asked the grand jury to return an in-

person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; ...
....
(b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.
(c) Any person violating this section shall be guilty of a class A felony.

dictment for the Carrying or Use of Firearm in the Commission of a Separate Felony[.]

b) On June 8, 2009, the properly constituted grand jury returned no bills on both proposed counts failing to find probable cause and that the state had not offered sufficient evidence to lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that [Metcalfe] had committed the proposed charges.

c) On June 25, 2009, the State filed an amended complaint charging the same offenses for which the grand jury had returned a no bill and on June 26, 2009 after a preliminary hearing the [H]onorable Joseph Florendo found probable cause existed for the said complaint and that the [S]tate had presented sufficient evidence to convince a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that the defendant did commit the offense of Murder in the Second Degree in Count [1], as well as Carrying or Using a Firearm in the Commission of a Separate Felony in [ ] Count [2]. This decision by the [H]onorable Judge Florendo was made when the prosecutor omitted significant evidence that the grand jury heard, some of which was exculpatory from this preliminary examination, and thus he did not have the benefit of hearing the entire circumstances of the offense.

d) Witnesses were called by the State ... in both the grand jury proceedings and in the preliminary examination.

. . . .

In a memorandum and supplemental memorandum in opposition to Metcalfe's motion to dismiss, the State argued, inter alia, that jeopardy did not attach at the grand jury phase and thus, Metcalfe's motion should be denied. At a January 28, 2010 hearing on Metcalfe's motion, the State asserted that

defense counsel's argument that the filing of the amended complaint violated double jeopardy and collateral estoppel was without merit. The State asserted that this court has not addressed this issue, but that other jurisdictions have "usually allowed" recharging a defendant unless specifically prohibited by statute, which Hawaii's statute does not proscribe. In response, defense counsel argued,

> ... [HRS § 806-8[4]] contemplates I think a situation where the—the prosecution if they don't like, you know, what the judge does at a preliminary examination, then they're free to go back and—and seek an indictment from a grand jury.

> But I don't think the legislature ever contemplated a situation where a grand jury declined to indict somebody, and then they go back. You know this, [HRS § 806-8] speaks of—of having an indictment ... after, uh, a judge has had a preliminary examination that—that was adverse to the State.

> But, you know, this case, Your Honor, there was considerably more evidence brought to the grand jury. They brought all the evidence including the 911 tape.

> And the grand jury, uh, apparently wanted to indict this defendant for manslaughter, and, uh, for whatever reason that did not happen, but they declined very vehemently to—to indict him for—for second degree murder.

The circuit court and defense counsel had the following discussion:

> Court: [W]e don't know what the State, as you know ... puts on in the grand jury, whether they had everything or not, but, uh, certainly, uh, I disagree with, uh, your—your argument that jeopardy attached at the grand jury[.]

> [Defense]: Oh, no. I[ ] agree it did not attach ... at the grand jury.

4. HRS § 806-8 (1993) provides:

In criminal cases brought in the first instance in a court of record, but in which the accused may be held to answer without an indictment by a grand jury, the legal prosecutor may arraign and prosecute the accused upon an information, complaint, or an indictment at the prosecutor's election; and in all criminal cases brought in the first instance in a court of record the prosecutor may arraign and prosecute the accused by information, complaint, or indictment, as the case may be, whether there has been a previous examination, or commitment for trial by a judge, or not.

Court: But even expanding it further cannot the State even with, uh, they refuse, uh, the first time to go back to the same grand jury or a different grand jury and produce different evidence?

[Defense]: Yes, Your Honor. I believe that they can ... but I'm just ... wondering what [ ] is the point of a grand jury? Why do we ever have a grand jury in Hawaiʻi if the State—if they don't like what the grand jury can do then ... it goes to a judge. It seems to me to disrespect the grand jury system.

. . . .

Court: [T]his is an interesting issue. You know, you got three ways the prosecutor can seek or even—not even three ways. And at what point ... could the prosecutor go back to the grand jury, the same one or a different grand jury and say[ ], "I'll keep trying until I get this person indicted for the charge at which"—

[Defense]: I think so if they—if they bring more evidence, but to me, Judge, it just seems like it's a—a slap in the face or we're thumbing our nose at our grand jurors who drove all this way to, you know, decline—

Court: Well, I'm not going into [ ] what the grand jury—

[Defense]: Right.

Court:—members felt, but I'm—I'm just saying does the process allow that?

[Defense]: I ... guess it does, Judge.

The circuit court orally denied the motion to dismiss, stating that jeopardy did not attach at the grand jury phase.[5] The circuit court issued an order, which stated, "The [c]ourt, having reviewed the records and files in this case and having heard the arguments of counsels, finds that there is no constitutional or statutory impediment prohibiting the State from proceeding by way of a preliminary hearing when a grand jury has filed a No Bill."

## B. Trial

### 1. State's Case–in–Chief

The State called Rocky Jordan, a friend of Metcalfe's who was present on the night of the incident in this case, to testify. Jordan lived in a separate dwelling on Metcalfe's property. Jordan stated that he helped Metcalfe install a surveillance system on Metcalfe's property that included four video cameras. Each camera pointed at separate buildings on Metcalfe's property: one toward the garage, one toward the greenhouse, one toward the chicken coop, and one toward the inside of the greenhouse. On three occasions prior to the incident at issue in this case, Jordan and/or Metcalfe reported to police that someone broke into Metcalfe's garage, and in total stole "several thousand dollars" worth of tools and building supplies.

Jordan testified that on May 6, 2009, he went to bed at 9:00 p.m. and received a phone call at about 10:30 p.m. from Metcalfe informing him to "[c]all 911 and come over here" because someone was trying to break into the greenhouse. Jordan ran outside and saw a man "coming at" Metcalfe, and Metcalfe yelling at the man to get down on the ground: "Come on, man. Get on the fucking ground." Jordan thought the man would "bowl Metacalf[e] over." Jordan then heard two shots. Jordan ran toward Metcalfe, who told him to, "Call 911. Tell 'em he's running down the driveway." Three to four minutes after the second shot, Jordan heard someone say, "Help. Somebody help me[.]" Jordan also testified that he, Metcalfe, and Metcalfe's wife, Sharon Meech, had medical marijuana permits. He stated that although he had smoked a "small amount" of medical marijuana on the day of the incident, the medical marijuana did not affect his memory of the events.

Hawaiʻi County Police Department (HCPD) Dispatcher Kevin Lee testified that he was transferred a call from a 911 emergency dispatcher on the night of May 6, 2009. He acknowledged that State's Exhibit 1–A was a true and accurate recording of the call. Without objection, State's Exhibit 1–A was received into evidence and published to the jury. In the recording, the following conversation occurred:

[Lee:] Hi, this is Kevin.

[Emergency dispatcher:] Kevin, um

[Lee:] Yeah

**5.** The circuit court did not file an order denying the motion until after trial concluded.

**214**

[Emergency Dispatcher:] —(Indiscernible) back. Shot at a burglar. He shot at a burglar—

[Lee:] Yeah. I got 'em. Got 'em. Thank you.

[Emergency Dispatcher:] Okay.

. . . .

[Lee:] Hi what's your name?

[Metcalfe:] Kevin Metcalfe.

[Lee:] Kevin Metcalfe?

[Metcalfe:] Yes.

[Lee:] Okay, and do you know where the person went that you shot?

[Metcalfe:] No. He ran down the driveway.

[Lee:] Did you—did you hit him, Kevin?

[Metcalfe:] Uh, I'm sure I did. Oh.

[Lee:] It was a break-in?

[Metcalfe:] It's just—it's just birdshot, though. He should be gone—gone. But I hope so.

. . . .

[Lee:] Kevin, what kind of shotgun did you use?

[Metcalfe:] Just a 12–gauge. Oh, dear God.

[Lee:] Did [ ] you see what he looked like, what he was wearing?

[Metcalfe:] Uh, no shirt. A Hawaiian guy. Fuck. Oh, man.

. . . .

[Lee:] Okay. What happened?

[Metcalfe:] I told 'em, 'Get down.' Then he says, 'Ah, fuck you.' He said somethin'. I don't know, and so I shot a round on the ground. I shot one, you know, away from him.

[Lee:] All right.

[Metcalfe:] He—he just kinda like came toward me so I shot again, and then he, I don't know, blasted past me, and I fuckin' shot again. Now he's probably down there fuckin' gearing up to come back.

. . . .

[Lee:] Okay. And where did you—when you—when you said you had him on the ground where was it? Right in front of the property?

[Metcalfe:] He never went on the ground. He just, you know, like I said he come out from behind the chicken coop. I don't know. Behind the chicken coop, and that was, uh, went past the chicken coop. Told him, you know, when I come out my garage door I told him, I said, 'Get on the fucking ground. I know you're there.' And then I went out to the chicken coop. When he come out from [ ] behind the chicken coop I said, 'Lay down right now. I've got a gun.' Sure he said, 'Fuck you,' I don't know. He said something or another, and I just pulled the gun away and shot, you know, away from him. Told him, 'Get down,' and that's when he bolted towards me, and I just kind of, I don't know, pulled the trigger. And then he kept going so I pulled the trigger again.

[Lee:] Gotcha. So you fired two shots at 'em?

[Metcalfe:] Yes, sir.

[Lee:] Total? Well, in the—in the vicinity?

[Metcalfe:] Uh-huh. I don't know.

[Lee:] Okay.

[Metcalfe:] I—sir, I don't know.

HCPD Officer John Smith, Jr., testified that he was dispatched to Metcalfe's residence at approximately 10:30 p.m., where he was met by Metcalfe and Jordan. Metcalfe told Officer Smith that he had shot a burglar: "He said, uh, he saw this, uh, guy, a male party, trying to break into a—a greenhouse." Metcalfe stated that he was in a "studio" building on the premises trying to figure out how to work surveillance equipment that he recently installed, when he observed a man trying to break into the greenhouse. Metcalfe exited the studio and saw the silhouette of the man running behind other structures on the property. Metcalfe then ran to confront the man. Metcalfe yelled at the man to "stop and lay on the ground." The man did not lie down as instructed, so Metcalfe discharged a shot on the ground, "as a warning shot." The man continued to run toward Metcalfe. Metcalfe shot at the man, and stated that he believed that he hit the man in the "front, uh, lower thigh area." The man then ran past Metcalfe down the driveway. Metcalfe could not remember the exact number of times he fired the shotgun, but he did remember shooting it twice. Officer Smith

found three shotgun shells at the scene. Officer Smith recovered a 12–gauge shotgun that Metcalfe said he used to shoot the man.

Officer Smith then searched for the man because Metcalfe had heard someone crying out for help prior to the arrival of the officers. Officer Smith walked down a road and discovered Kuahuia on the road lying face up. Metcalfe was following him, and when Metcalfe saw Kuahuia, he stated, "Oh Jesus, that's him." Officer Smith stated that he checked for a pulse and breathing, but Kuahuia's body felt cold. There were no visible injuries to Kuahuia's body as it lay face up. When medical personnel moved Kuahuia's body, Officer Smith observed "[a] buncha holes in his back. A lotta [sic] holes in his back."

On cross-examination, Officer Smith stated that Metcalfe indicated that the man may have been accompanied by other individuals. Metcalfe also appeared "extremely distraught" when he saw Kuahuia's body. Officer Smith also testified regarding the mechanism of a shotgun, the differences between and function of different types of shotgun shells, and his prior experiences hunting and shooting with a shotgun with the same type of ammunition used in this case. He stated that when a shotgun is fired, the pellets in the shell stay "tight together before they start spreading out as they go farther away from the shotgun." Officer Smith stated that the spread pattern from number 6 birdshot ammunition, which was the type of ammunition used on the night of the incident and recovered at the scene, fired at 60 feet would be "more spread out than at 30 feet." Officer Smith stated that Kuahuia's body was discovered approximately four hundred yards away from the greenhouse.

On redirect examination, Officer Smith was questioned about Metcalfe's "condition" on the night of the incident. Officer Smith testified that he was a drug recognition expert, that he could smell marijuana on the night of the incident, and that he could not tell if the marijuana smell was coming from Metcalfe. Officer Smith also acknowledged that he was shot with number 6 birdshot when he was a child.

On recross examination, Officer Smith stated that in the childhood shooting, he was shot in his right back shoulder from a distance of approximately sixty feet. Officer Smith stated that he did not go to the hospital or to see a doctor after he was shot, and said that none of the pellets penetrated his skin. Upon further examination, Officer Smith testified that he was wearing a hunter's vest when he got shot.

HCPD Officer Henry Ivy was dispatched to Metcalfe's residence at 10:30 p.m. On cross-examination, Officer Ivy stated that Metcalfe appeared to be in "distress," distraught, and "very scared."

HCPD Detective Sean Smith testified that he was assigned to investigate the incident. Detective Smith interviewed Jordan, who recalled that, from a distance of thirty feet, Jordan could see a man "running towards" Metcalfe.

Dr. Anthony Manoukian testified that he was a pathologist, laboratory director at Maui Memorial Medical Center, and the coroner's physician for Maui County, Hawai'i County, and the County of Kauai. Dr. Manoukian testified that he was a licensed physician and surgeon in Hawai'i, specializing in pathology and forensic pathology. He stated that he was educated at the University of Hawai'i at Manoa, is an assistant clinical professor at the University, and is a member of the College of American Pathologists and the American Society for Clinical Pathology. Dr. Manoukian is certified in anatomic, clinical, and forensic pathology from the American Board of Pathology. He has performed over 3,000 autopsies, of which over 100 were performed on bodies where the cause of death was the result of an injury caused by a firearm.

Dr. Manoukian stated that he received training with regard to firearms:

Well, there was the—as part of the, um, forensic training in Baltimore with the Office of the Chief Medical Examiner we had autopsy experience in deaths due to firearms.

In addition we, uh, attended classes at the Maryland State Crime Lab and also, uh, at the, uh, FBI Academy in Quantico, Virginia.

. . . .

Well, the training involved recovery of projectiles and, um, basically how to conduct an autopsy in which, uh, the death was due to firearms.

And we had some specialized training in, uh, ballistics with the Maryland State Crime Lab, and we had the opportunity to fire different, uh, types of, uh, firearms on a shooting range.

Dr. Manoukian performed an autopsy on Kuahuia and determined "within the bounds of reasonable medical certainty" that Kuahuia died due to "a shotgun wound to the back." Dr. Manoukian stated that the "linear grazing wounds" present on both sides of Kuahuia's body indicated the "trajectory of the shotgun wound and also the range of fire of the shotgun wound." Specifically, the linear grazing wounds helped Dr. Manoukian determine that the trajectory of the shotgun wound was "back to front[,]" i.e., "it indicate[d] the position of the decedent's body to the barrel of the shotgun at the time the shotgun was discharged."

In addition, Dr. Manoukian testified that there was "no evidence of close-range firing" because there was no "large central defect," there was no gunpowder on the skin of Kuahuia's back, and there was no evidence of a "wad injury," i.e., "no imprint of the wad [of the shotgun shell] on [Kuahuia's] skin[.]" Dr. Manoukian stated, "in the textbooks of forensic pathology for a shotgun using birdshot there's a general rule of thumb that the diameter of the pellet injury times three equals in a ballpark figure the distance in feet between the decedent and the barrel of the shotgun." Inasmuch as the "spread" on Kuahuia's back was 21.5 inches, Dr. Manoukian estimated that the distance from the shotgun barrel to Kuahuia's body at the time of firing was approximately 60 feet. Dr. Manoukian stated that there were approximately 150 to 200 pellets that struck Kuahuia, of which approximately 20 to 40 entered Kuahuia's chest and abdomen, injuring Kuahuia's two lungs, his two kidneys, and his spleen.

Dr. Manoukian testified that there were no gunshot wounds to the front of Kuahuia's body and that Kuahuia had "some scraping of the skin" on the front of his body, which he attributed to Kuahuia collapsing to the ground after being shot. Dr. Manoukian further stated that this was a "distant[ ] shotgun wound" because there was "an absence of a central large defect where pellets have entered." Defense counsel did not object at any time during Dr. Manoukian's testimony.

Herbert Hamersma, an HCPD evidence custodian, testified that he received, stored, and tracked various physical items that were recovered from the scene from different detectives, including Kuahuia's clothes, a shotgun, three used shotgun shells, and a hacksaw.[6]

HCPD Evidence Specialist Lauren Wong testified that she photographed Kuahuia's body at the scene. Specialist Wong stated that she also created a diagram of the scene using a "Total Station" device to measure the distances between "relevant objects" at the scene. She stated, "The Total Station sends out a signal, and it is reflected off of the target . . . and the information is recorded in terms of angle and distance. . . . The Total Station is connected to a wireless, uh, handheld computer which records the electronic data for us that may not be altered once it's put in there." Specialist Wong testified that, using the Total Station, she measured the distance between a hacksaw and the closest shell casing as being approximately 47.8 feet. The next closest shell casing was 51.1 feet from the hacksaw. The furthest casing was 66.3 feet from the hacksaw.

On cross-examination, Specialist Wong stated that she did not know if the Total Station device was calibrated. On redirect, Specialist Wong testified that the device "appear[ed] to be working as it should" and there was no indication that the data she received was wrong. On re-cross, Specialist Wong acknowledged that she never took measurements through any other means to verify the Total Station device's accuracy.

---

6. A hacksaw was recovered at the scene of the incident. Metcalfe testified that he was "scared to death" because Kuahuia charged at him while holding "the same thing that he was trying to cut through the greenhouse with or a weapon of some sort" in his right hand. During closing arguments, defense counsel argued that Kuahuia was holding State's Exhibit 17, which is the hacksaw recovered at the scene, when he charged at Metcalfe.

HCPD Detective Myra Iwamoto testified that she followed Kuahuia's body to the morgue and recovered the clothing from the body. On cross-examination, defense counsel asked Detective Iwamoto whether she knew if Dr. Manoukian performed a gunshot residue test on Kuahuia's body. Detective Iwamoto stated that she was not sure if Dr. Manoukian conducted a gunshot residue test. Detective Iwamoto acknowledged that as far as she knew, someone could have gunshot residue on their person if they are in close proximity to a gun that is being discharged.

HCPD Detective Walter Ah Mow testified that he was certified as the firearms instructor for the HCPD. Detective Ah Mow was trained by the FBI in 2001 and 2004, and certified by the National Rifle Association in 2005. He received FBI training on "handl[ing]," "basic field stripping," and "maintain[ing] and clean[ing]" shotguns. On May 6, 2009, Detective Ah Mow was initially assigned to "be in charge" at the scene. Detective Ah Mow stated that a Browning semi-automatic 12–gauge shotgun was recovered during the investigation. On May 11, 2009, Detective Ah Mow test fired the recovered shotgun to conduct pattern testing, specifically, "to determine the distance of, uh, the shotgun as the pellets go through the barrel and make a spread pattern onto a target." The pattern testing involved firing the shotgun from various distances from a target to ascertain the "spread" of pellets on the target. Detective Ah Mow purchased and fired ammunition identical to that recovered from Metcalfe's residence. He stated that each shell, a "number 6" birdshot, was designed to kill birds and contained approximately "[t]wo hundred BB's."

Detective Ah Mow fired the shotgun from set distances of 10 feet, 20 feet, 30 feet, 40 feet, 50 feet, and 55 feet. At a distance of 10 feet, the spread pattern was approximately 3.75 inches. At 20 feet, the spread pattern was approximately 7.5 inches. At 30 feet, the spread pattern was approximately 12.5

inches. At 40 feet, the spread pattern was approximately 16.75 inches. At 50 feet, the spread pattern was approximately 25.5 inches. At 55 feet, the spread pattern was approximately 25.5 inches. Detective Ah Mow also fired the shotgun from specified distances of 47 feet, 8 inches, and 51 feet, 1 inch, which correlated with distances measured on the Total Station Device. At a distance of 47 feet, 8 inches, the spread pattern was approximately 23.5 inches. At a distance of 51 feet, 1 inch, the spread pattern was approximately 27.5 inches. Detective Ah Mow was asked what the spread pattern indicated, and he stated, "Just to make it simple, the spread pattern[ ] measures the distance between the muzzle to target." Detective Ah Mow also testified that Metcalfe's shotgun did not have a "choke," which would have affected the spread of the pellets as "every spread pattern would be different" "depending on what kind of choke" was on the shotgun. Defense counsel did not object to Detective Ah Mow's testimony.

On cross-examination, Detective Ah Mow acknowledged that because the recovered shotgun was semi-automatic it was conceivable that, if multiple shots were fired rapidly at a target, it would be hard to distinguish the spread pattern of one round with the spread pattern of the other. Detective Ah Mow also acknowledged that he performed these tests in an "ideal laboratory condition" where the weather was constant, and neither the target nor the shooter was moving. He also recognized that movement of the target or muzzle of the shotgun could substantially distort the spread pattern. Detective Ah Mow also acknowledged that a substantial number of pellets did not penetrate the cardboard target at the closer distances of 10 and 20 feet. On redirect-examination, Detective Ah Mow stated that although some pellets did not go through the cardboard target, a majority of the pellets did go through.

The State rested [7] and Metcalfe moved for a judgment of acquittal on the murder

---

7. Additional witnesses testified for the State. Elizabeth Taetuna, Kuahuia's mother, identified her son in a photograph. HCPD Detective Charlotte Bird testified that she was assigned to collect evidence. Through the testimony of Detective Bird, the State admitted, without objection, Exhibit 76, which was a picture of the inside of

Metcalfe's greenhouse, containing what appeared to be marijuana plants. Detective Bird stated that the photograph "accurately depicted the scene that [she] saw at the time th[e] photograph was taken[.]" HCPD Officer Shawn Ibarra testified that he stood watch so that no one would enter the scene. HCPD Officer Clayton Tayamen

charge, arguing that the State adduced no evidence of an intentional killing. The circuit court denied the motion on the ground that the evidence, when viewed in the light most favorable to the State, was sufficient for a reasonable jury to conclude that Metcalfe's actions were intentional or knowing when he fired the shotgun at Kuahuia.

### 2. Defense Case

Metcalfe testified in his own defense. On May 6, 2009, at approximately 10:25 p.m., Metcalfe was figuring out how to work his surveillance security system when his motion detector alarm came on. When he looked at his security system's monitor, Metcalfe noticed what, at first, appeared to be a garbage bag blowing in the wind. Metcalfe then saw a man standing upright with "something in his hand." Metcalfe saw the individual try to cut through a shade cloth that was draped over the greenhouse. He called Jordan to tell him that someone was in the yard and that Jordan should call 911.

Metcalfe went outside without an intention to hurt the person that was on his property. He took his recently purchased 12–gauge shotgun and loaded it with number 6 birdshot ammunition. He decided not to use his buckshot ammunition because a buckshot "would really hurt somebody."

Metcalfe exited the studio with his shotgun and a flashlight. Metcalfe saw a man crouched down on the ground. He stated to the man, "Look, come outta there. I got a gun. Come out. Put your hands up. Get on the ground." After Metcalfe shined a flashlight on the man, who was eight to ten feet away from him, the man "crab walked" toward Metcalfe. Metcalfe then told the man, "Please, just get on the f'in' ground." Metcalfe stated that "all at once" the man, who had "something" in his right hand, jumped towards him. Metcalfe stated that the man probably had "the same thing that he was trying to cut through the greenhouse with or a weapon of some sort" in his right hand. The man came to within "three feet" and "hollered, 'F you,' really loud" at Metcalfe. Metcalfe then fired a "warning shot," as he

testified that he arrested Metcalfe. HCPD Detective Charles Adams photographed the scene and

stepped backward, because he wanted the man to know that he was serious and because he was "scared to death." Metcalfe stated that he was scared for himself and denied firing the shots to protect his property.

After firing the first shot, Metcalfe stated that all he could see was "spots." Metcalfe stated that from the flash he could still see that the man was "propelling himself forward" toward Metcalfe. Metcalfe stated that he fired another shot because he felt he had no other alternative. Metcalfe stepped backwards, but the man did not stop. The man ran away and Metcalfe called 911, and subsequently heard someone "holler 'help[,]' " but the dispatcher told Metcalfe to stay where he was. About fifteen or twenty minutes after the police arrived, he and an officer discovered Kuahuia's body. Metcalfe stated, "I was beside myself. I just couldn't even fathom anything. I was just lost. I was just in shock and pure fear for him."

On cross-examination, the State questioned Metcalfe about his medical marijuana permit. Metcalfe stated that he had a medical marijuana permit for the ten plants that were in the greenhouse on his property. He acknowledged that he used the marijuana for his irritable bowel syndrome. Metcalfe stated that on the evening of the incident he smoked "maybe a gram" of his medical marijuana. The following exchange occurred:

[State]: On May 6, 2009, would you, uh, 2009, would you deem yourself addicted to marijuana?

[Metcalfe]: No.

[State]: Because you don't believe marijuana is addicting. Is that right?

[Metcalfe]: Um, anything you smoke—

[Metcalfe's counsel]: I'm gonna object to the relevance of this line of questioning.

[Court]: Overruled.

[Metcalfe]: Um, I don't know. I don't—I don't. It's nothing like cigarettes. You can put—for me. I don't know about the rest of the world, but sometimes I do things and I don't like marijuana in my system I may not use it for days.

obtained a search warrant for Kuahuia's vehicle.

[State]: Okay, but you had marijuana in your system on May the 6, 2009. Is that right?

[Metcalfe]: Oh, yes, sir. It stays in your system for 30 days.

When asked whether Metcalfe set up the surveillance system to protect the marijuana plants in his greenhouse, Metcalfe responded, "I had a lotta [sic] tools in the greenhouse. I don't know if anybody's told you that, but in—I'm sure they've looked at it, took pictures of it. You should know that. It wasn't just marijuana plants, sir."

Metcalfe also stated that he fired the shotgun three times and that the man "blew past" him. Metcalfe stated that he did not know if he shot the man but that, because the man was so close, he wanted a "wall of safety" between himself and the man. Metcalfe stated that the first two shots "went off so fast it was basically just like a double flashbulb." Metcalfe acknowledged that his property had been burglarized five times prior to the incident.

Sharon Meech, Metcalfe's wife, testified that their property had been burglarized five to seven times. She also testified that a burglary occurred in October 2008 that scared her and led her to leave Hawai'i for Oregon.

The defense rested and Metcalfe renewed his motion for judgment of acquittal, which the circuit court denied.

### 3. Jury Instructions, Closing Arguments and Verdict

Prior to closing arguments, the circuit court and the parties settled the jury instructions. Relevant to the issues raised on appeal, the parties agreed to the State's proposed instructions on self-defense, with modifications, and also agreed to the State's instruction regarding opinion testimony. In regard to the modifications of the State's proposed instructions on self-defense (State's Instructions 11, 12, and 13), the parties agreed that the instruction should be modified to include the definition of "bodily injury" and "serious bodily injury." The parties also agreed to modify the language in State's Instruction 11, which stated, "If the prosecution does not meet this burden then you <u>may not</u> find the Defendant guilty of Murder in

the Second Degree or Manslaughter" to "If the prosecution [does] not meet this burden then you <u>must</u> find the [D]efendant <u>not</u> guilty of Murder in the Second Degree or Manslaughter." (Emphasis added).

The State acknowledged that its proposed Instruction 15, regarding opinion testimony, modified the language of the standard jury instruction 4.05 because it "eliminate[d] use of [the] word 'expert[.]'"

The jury was subsequently given various instructions, including the following instructions regarding self-defense:

> The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person.

> "Force" means any bodily impact restraint or confinement or the threat thereof.

> "Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force or deadly force.

> The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that the deadly force is immediately necessary to protect himself on the present occasion against death or serious bodily injury.

> "Deadly force" means force which the actor uses with the intent of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Intentionally firing a firearm in the direction of another person or in the direction which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that the actor will use deadly force if necessary does not constitute deadly force.

> "Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes a serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Except as provided below, a person employing protective force may estimate the necessity thereof under the circumstances as he reasonably believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action. The use of deadly force is not justifiable under this section if:

a) The actor, with the intent of causing death or serious bodily injury provoked the use of force against himself in the same encounter; or

b) the actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take except that the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor.

The reasonableness of the Defendant's belief that the use of such protective force or deadly force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstance of which the Defendant was aware or as the Defendant reasonably believed them to be.

Justifiable use of force, commonly known as self defense is a defense to the charge of Murder in the Second Degree and Manslaughter. Once there is any evidence of justification, the burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable. If the prosecution does not meet this burden then you must find the Defendant Not Guilty of Murder in the Second Degree and Manslaughter.

In evaluating a claim of self defense, you should proceed as follows:

First you should determine if the Defendant had the belief that the force or deadly force was immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person, (and in the case of deadly force, against death or serious bodily injury).

For this part of the test, you should place yourself in the shoes of the defendant. If you find that Defendant did not have the subjective belief that the force he used was immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person, as set forth above, then the State has disproven the defense of self defense. If the State has not disproven Defendant's subjective belief, then you should go on the second part of the test [sic].

Secondly, you should determine whether a reasonably prudent person in the same situation as the Defendant would have believed that the force used was necessary against the use of unlawful force. If the State has shown that a reasonably prudent person in the same situation as the defendant would not have believed that the force was so necessary, then you must reject the defense of self defense.

The circuit court gave State's Instruction 15, concerning opinion testimony, by agreement:

During the trial you heard the testimony of one or more witnesses who were allowed to give opinion testimony.

Training and experience may make a person qualified to give opinion testimony in a particular field. The law allows that person to state an opinion about matters in that field. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. It is up to you to decide whether to accept this testimony and how much weight to give it. You must also decide whether the witness's opinions were based on sound reasons, judgment, and information.

The jury was not instructed on defense of property.

In its closing argument, the State asserted that Metcalfe intentionally shot Kuahuia in

the back from a distance of at least forty feet after Kuahuia ran past him. In his closing argument, defense counsel argued that Metcalfe acted in self-defense when Kuahuia charged at him with "something that could have slit [Metcalfe's] throat." Defense counsel also asserted that the evidence indicated that Kuahuia was shot from a close distance. Defense counsel explained that Kuahuia was shot in the back because Kuahuia was initially in a "crab-walk position" when Metcalfe fired the first shot and subsequently turned when Metcalfe fired the second shot. Defense counsel then argued that Dr. Manoukian's testimony that Kuahuia was shot from a distance of sixty feet was "physically impossible" in light of the evidence that showed the downward slope of the driveway that Kuahuia ran down. Defense counsel further contended that Kuahuia could not have been shot from a distance of sixty feet given that none of the pellets penetrated Officer Smith's skin when he was shot with number 6 birdshot from a distance of sixty feet, or given that not all of the pellets penetrated through the cardboard silhouettes that Detective Ah Mow fired upon from a distance of sixty feet. Defense counsel thus asserted that the only reasonable inference from this evidence was that Kuahuia was shot from a distance of eight to ten feet. In addition, defense counsel noted that there was no evidence that the Total Station Device was calibrated, but that "[t]he only thing we do know is that [Kuahuia] made it 47 feet with [the hacksaw] from the greenhouse, and that's why we know that it was in his hand[.]"

The jury found Metcalfe guilty of the included offense of Manslaughter and the offense of Use of a Firearm in the Commission of a Felony. On March 25, 2010, the circuit court entered its Judgment of Conviction and Sentence, convicting Metcalfe of Manslaughter and Use of Firearm in the Commission of a Separate Felony and sentencing Metcalfe to an indeterminate term of imprisonment of twenty years on each count, to run concurrently. Metcalfe filed a timely notice of appeal.

## C. ICA Appeal

On appeal to the ICA, Metcalfe raised several arguments, including, that the circuit court erred in denying his motion to dismiss the complaint after the grand jury returned a no bill, that the circuit court plainly erred in allowing the testimony of Dr. Manoukian and Detective Ah Mow without properly qualifying them, that the circuit court plainly erred in instructing the jury on opinion testimony and self-defense, that the circuit court plainly erred in failing to instruct the jury on defense of property and provide a cautionary instruction on medical marijuana, that there was insufficient evidence that the shotgun fired by Metcalfe was a "firearm," and that Metcalfe's trial counsel was ineffective.

In its March 30, 2012 Memorandum Opinion, the ICA rejected all of Metcalfe's claims and determined: (1) the circuit court did not err in denying Metcalfe's motion to dismiss; (2) the circuit court did not plainly err in allowing the opinion testimony of Dr. Manoukian and Detective Ah Mow, because their testimony established their qualifications as experts under HRE Rule 702; (3) the circuit court did not plainly err in providing the jury with an instruction regarding opinion testimony, which was modified from the standard expert witness instruction, because the instruction accurately stated the law; (4) the circuit court did not plainly err in instructing the jury on self-defense; (5) a jury instruction regarding defense of property was not required; (6) a cautionary jury instruction regarding medical marijuana was not required; and (7) there was sufficient evidence that the shotgun fired by Metcalfe was a "firearm." [8] *Metcalfe*, 2012 WL 1071503, at **4–17. Finally, the ICA determined that Metcalfe's trial counsel was not ineffective because Metcalfe failed to show that his trial counsel made errors that resulted in the withdrawal or substantial impairment of a potentially meritorious defense. *Id.* at *17–20 (citing *State v. Wakisaka*, 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003)).

8. This issue is not raised in Metcalfe's application and as such is not discussed further herein. *See* HRAP Rule 40.1(d)(1) ("The application ... shall contain ... [a] short and concise statement of the questions presented for decision[.] ... Questions not presented according to this paragraph will be disregarded.").

Accordingly, the ICA affirmed the circuit court's March 25, 2010 judgment. *Id.* at \*10. The ICA filed its judgment on appeal on April 24, 2012.

## II. Standards of Review

### A. Motion to Dismiss an Indictment

■ "A [trial] court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion." *State v. Akau,* 118 Hawai'i 44, 51, 185 P.3d 229, 236 (2008) (citation omitted). In addition, "[t]he trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." *State v. Wong,* 97 Hawai'i 512, 517, 40 P.3d 914, 919 (2002) (citation omitted).

### B. Plain Error

■ Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, an appellate court "may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Staley,* 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (citation omitted).

■ The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Nichols,* 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (quoting *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)). An appellate court's "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *Nichols,* 111 Hawai'i at 335, 141 P.3d at 982 (quoting *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

### C. Admission of Expert Testimony

■ "Generally, the decision whether to admit expert testimony rests in the discretion of the trial court. To the extent that the trial court's decision is dependant upon interpretation of court rules, such interpretation is a question of law, which [the appellate] court reviews de novo." *Barcai v. Betwee,* 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

### D. Jury Instructions

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (internal quotation marks, brackets, and citations omitted); *see also Nichols,* 111 Hawai'i at 337, 141 P.3d at 984 ("[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.").

### E. Ineffective Assistance of Trial Counsel

This court has determined,

When reviewing a claim of ineffective assistance of counsel, [the appellate court] looks at whether defense counsel's assistance was within the range of competence demanded of attorneys in criminal cases. The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. To satisfy

this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice.

*Wakisaka,* 102 Hawai'i at 513–14, 78 P.3d at 326–27 (internal quotation marks, citations, and footnote omitted).

### III. Discussion

**A. The circuit court did not abuse its discretion in denying Metcalfe's motion to dismiss the amended complaint**

■ Metcalfe argues that the circuit court "abused its discretion when it denied [his] [m]otion to [d]ismiss without reviewing the grand jury and preliminary hearing transcripts." As discussed below, Metcalfe's contention is without merit because Metcalfe did not provide the circuit court with the grand jury or preliminary hearing transcripts.

Metcalfe filed a motion to dismiss the amended complaint on grounds that it violated double jeopardy and collateral estoppel. Attached to his motion to dismiss was a Declaration of Counsel, which stated that the State improperly filed the amended complaint after the grand jury returned a "no bill." Defense counsel implied that, at the subsequent preliminary hearing, Judge Florendo found probable cause only because "the prosecutor omitted significant evidence that the grand jury heard, some of which was exculpatory from this preliminary examination, and thus [the court] did not have the benefit of hearing the entire circumstances of the offense." In relation to his motion to dismiss, Metcalfe asked the court to take judicial notice of the record and transcripts of the grand jury and preliminary hearings, but did not provide the circuit court with these transcripts. After hearing arguments from both parties regarding the applicability of double jeopardy, the circuit court orally denied the motion to dismiss on the narrow ground that double jeopardy did not attach at the grand jury phase of the proceeding, and as a result, the State was not precluded from filing an amended complaint and seeking probable cause via a preliminary hearing.

Metcalfe's argument that the circuit court abused its discretion in denying the motion to dismiss without reviewing the grand jury and preliminary hearing transcripts is without merit. Metcalfe did not include the relevant portions of the transcripts with his motion to dismiss, nor did he attempt to enter the transcripts into evidence during the hearing on the motion. *Cf. State v. Hoang,* 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (holding that it is the "appellant's burden of demonstrating error in the record" and noting that this court has previously held that where the record was insufficient to show that the alleged improper testimony influenced the grand jury, it will be presumed that the indictment was found as the law directs) (citing *State v. Apao,* 59 Haw. 625, 638, 586 P.2d 250, 259 (1978) *superceded by statute on other grounds as stated in Briones v. State,* 74 Haw. 442, 456 n. 7, 848 P.2d 966, 973 n. 7 (1993)). Thus, the transcripts were not before the court. Metcalfe also contends that the circuit court abused its discretion in denying the motion because it stated in its written order that it "reviewed the records and files in this case[,]" but did not review the grand jury and preliminary hearing transcripts. However, there is nothing to indicate that the circuit court's statement is erroneous, or that the circuit court did not review the records that were before it, which, as stated, did not include the grand jury or preliminary hearing transcripts.

■ Similarly, Metcalfe's apparent assertion that the circuit court should have taken judicial notice of the transcripts lacks merit. HRE Rule 201 allows a court to take judicial notice of adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[,]" which includes some court records. HRE Rule 201(b); *see also Ditto v. McCurdy,* 98 Hawai'i 123, 130, 44 P.3d 274, 281 (2002). However, a court is not required to sua sponte order transcripts when asked to take judicial notice of prior proceedings. Rather, a court must take judicial notice of adjudicative facts only if "requested by a party <u>and supplied with the necessary information.</u>" HRE Rule 201(d) (emphasis added). Here, the circuit court was not "supplied with the necessary information" to take judicial notice of the content of the grand jury and preliminary hearing

transcripts, because Metcalfe did not include those transcripts in the record.

 Finally, although Metcalfe does not challenge the substantive basis for the circuit court's ruling in his application, the circuit court did not abuse its discretion in denying the motion based on the record before the court, i.e., the motion to dismiss and the attached declaration, Metcalfe's memorandum in support of his motion, the State's memorandum and supplemental memorandum in response to the motion to dismiss, and the arguments of the parties during the hearing on the motion. The circuit court denied the motion on the ground that double jeopardy does not bar the prosecution from filing an amended complaint after the grand jury returned a "no bill." Jeopardy does not attach at the grand jury stage, but instead "in a jury trial[,] jeopardy attaches once the jury is empaneled and sworn[.]" *State v. Moriwake*, 65 Haw. 47, 51, 647 P.2d 705, 709 (1982). Additionally, Metcalfe's counsel conceded in the circuit court that double jeopardy did not apply. Therefore, the circuit court did not abuse its discretion in denying Metcalfe's motion to dismiss on this basis.

Accordingly, the ICA did not gravely err in rejecting Metcalfe's arguments on this point. The question of whether defense counsel was ineffective in failing to provide the grand jury and preliminary hearing transcripts to the circuit court for its consideration in deciding the motion is discussed *infra*.

### B. The circuit court did not plainly err in allowing the testimony of Dr. Manoukian and Detective Ah Mow

Metcalfe argues that the ICA gravely erred in affirming the circuit court's decision to allow the testimony of Dr. Manoukian and Detective Ah Mow without formally qualifying them as expert witnesses under HRE Rule 702. Specifically, Metcalfe argues that the circuit court's failure to formally qualify Dr. Manoukian and Detective Ah Mow as experts in the field of ballistics constituted plain error because, while the record may establish that Dr. Manoukian was an expert in forensic pathology and that Detective Ah Mow was an expert in the use or identification of firearms, neither was an expert in ballistics. Since the State's case relied heavily on these witnesses' testimony regarding ballistic evidence, Metcalfe contends that the ICA erred in concluding that any error in admission of the testimony was harmless.

In response to Metcalfe's application, the State asserts that there is a "trend" around the country and in the Third Circuit to avoid using the term expert during a jury trial. However, Metcalfe argues that this trend to not qualify individuals as experts in a particular field is improper because, as shown in this particular case, the jury was "misled into believing that the entire content of [Dr. Manoukian's] testimony, including the erroneous opinion on distance, was based upon expert qualifications."

Metcalfe did not object to the testimony of Dr. Manoukian or Detective Ah Mow during trial, and accordingly, this issue may be deemed waived. *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases."); Addison M. Bowman, *Hawai'i Rules of Evidence Manual* § 103–2[1] (2010–11 ed.) ("An opponent who fails to object is held to have waived the appellate point."); *see* HRE Rule 103(a)(1) (requiring a "timely objection or motion to strike"); *State v. Crisostomo*, 94 Hawai'i 282, 290, 12 P.3d 873, 881 (2000) ("A hearsay objection not raised or properly preserved in the trial court will not be considered on appeal. This is true even where the testimony is objected to on other grounds.") (citation omitted); *State v. Sua*, 92 Hawai'i 61, 76, 987 P.2d 959, 974 (1999) (holding that the defendant waived the issue of whether certain prior inconsistent statements were properly recorded pursuant to HRE Rule 802.1(1)(C) because the defendant failed to object at trial on that ground, thereby rendering those statements admissible); *State v. Samuel*, 74 Haw. 141, 147, 838 P.2d 1374, 1378 (1992) ("Appellant's attorney failed to preserve this alleged 'error' by not objecting to it at trial. The general rule is that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute grounds for reversal.").

 Nevertheless, HRPP Rule 52(b) provides that "[p]lain errors or defects affecting

substantial rights may be noticed although they were not brought to the attention of the court." However, objections to the admission of incompetent evidence, which a party failed to raise at trial, are generally not subject to plain error review.[9] *State v. Wallace*, 80 Hawai'i 382, 410, 910 P.2d 695, 723 (1996) ("It is the general rule that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute ground for reversal. It is equally established that an issue raised for the first time on appeal will not be considered by the reviewing court. Only where the ends of justice require it, and fundamental rights would otherwise be denied, will there be a departure from these principles.") (citation omitted); *State v. Uyesugi*, 100 Hawai'i 442, 464, 60 P.3d 843, 865 (2002) ("In the absence of an objection and/or proper record, the admission of the testimony and picture does not amount to plain error.").

Moreover, even assuming that plain error review is available, the circuit court's failure to formally qualify Dr. Manoukian and Detective Ah Mow as experts in the field of ballistics did not affect Metcalfe's substantial rights and did not preclude the admission of the testimony of Dr. Manoukian and Detective Ah Mow into evidence under HRE Rule 702.

First, the plain language of HRE Rule 702 does not require the circuit court to formally qualify a witness as an expert before receiving the witness's testimony into evidence. HRE Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

*Id.*

The plain language of HRE Rule 702 suggests that, to testify as an expert witness, one need only possess the requisite "knowledge, skill, experience, training or education" to offer an opinion on a subject requiring "scientific, technical, or other specialized knowledge[.]" It does not indicate that the trial court must formally qualify a witness as an expert in front of the jury before the witness's testimony can properly be admitted.[10]

Indeed, there are judges that have advocated for the elimination of the use of the

9. The dissent argues that in *State v. Schnabel*, 127 Hawai'i 432, 279 P.3d 1237 (2012), this court determined that we may notice errors affecting a defendant's substantial rights regardless of whether an objection was raised at trial. Dissent at 249, 297 P.3d at 1105. However, the evidentiary errors at issue in *Schnabel* implicated the defendant's right to testify. 127 Hawai'i at 461–63, 279 P.3d at 1266–68. Here, Metcalfe's right to testify was not implicated. Thus, plain error review is not appropriate in the circumstances of this case. Indeed, this court has repeatedly stated that our "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system-that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Fields*, 115 Hawai'i 503, 529, 168 P.3d 955, 981 (2007) (citation omitted).

Moreover, *Schnabel* is distinguishable from the instant case because there, a majority of this court relied upon judicial notice in making its

determination to vacate the conviction and remand the case for a new trial. 127 Hawai'i at 446–47, 279 P.3d at 1251–52. The majority referenced plain error only as an alternative argument. *Id.*

10. Contrary to the dissent's assertion, the commentary to HRE Rule 702 does not require the court to state in front of the jury that an individual is an expert in a particular field. *See* Dissent at 244–45, 297 P.3d at 1100–01. The commentary to HRE Rule 702 provides in relevant part:
> Determination by the court that a witness qualifies as an expert is binding upon the trier of fact only as this relates to admissibility of the expert's testimony. The trier of fact may nonetheless consider the qualifications of the witness in determining the weight to be given to his testimony.

This commentary merely provides that the court's determination regarding admissibility is binding on the trier of fact. It does not require that the jury be advised of the court's determination regarding a witness's expertise. Thus, the dissent's reliance on the commentary to HRE Rule 702 is not persuasive.

term "expert" from jury proceedings to "ensure that juries are not overwhelmed by the so-called 'experts,' so as to deprive them of their right to determine the facts of a case based upon all of the evidence" and to "ensure[ ] that trial courts do not inadvertently put their stamp of authority on 'expert' testimony." *See* Honorable Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" under the Federal Rules of Evidence in Civil and Criminal Jury Trials,* 154 F.R.D. 537, 558–59 (1994); [11] *see also* 1 *McCormick on Evidence,* § 13, at 69 n.14 (Kenneth S. Bround, et al. eds., 6th ed. 2006) (noting that some courts recognize that a finding by the court that an individual is an expert "might influence the jury in its evaluation of the expert and the better procedure is to avoid an acknowledgment of the witness's expertise by the court") (citation omitted). In *Barbee v.*

*Queen's Medical Center,* 119 Hawai'i 136, 155, 194 P.3d 1098, 1117 (App.2008), the ICA also recognized that some trial courts do not make any findings before the jury regarding the qualifications of an expert witness, and determined that this practice did not constitute an abuse of discretion.[12] *See also* HRE Rule 1102 ("The court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence.").

▆▆▆▆ Although the State suggests in its response that the failure to qualify Dr. Manoukian and Detective Ah Mow may have been purposeful in this case, the record does not expressly reflect a reason for the court's approach.[13] In any event, nothing in the HRE would preclude the trial court from declining to qualify a witness as an expert in front of the jury, so long as the requisite foundation for the witness's testimony is established.[14] *See* HRE Rule 702. Such foun-

11. The dissenting opinion implies that Judge Richey's procedure requires the court to make a finding in front of the jury that an individual was qualified to render an opinion in a particular field. Dissent at 246–48, 297 P.3d at 1102–04. However, as the dissent further notes, *see* dissent at 246–47, 297 P.3d at 1102–03, Judge Richey proposes judicial supervision through mechanisms such as pre-trial hearings, which occur outside of the presence of the jury. Richey, 154 F.R.D. at 542 ("As a result of barring the use of the word 'expert' in my courtroom, I ensure that no untoward affiliations unfold between opinion witnesses and the jury."). Furthermore, Judge Richey stated, "No one seriously questions the proposition that so-called 'expert witnesses' can add an aura of authority to any asserted opinion. But it does not follow that courts and judges should give 'expert' witnesses their imprimatur[.]" *Id.* at 545. In addition, Judge Richey stated that under his proposal, the court would be under an obligation to provide the jury only with a limiting or cautionary instruction concerning the opinion testimony. *Id.* at 551. Thus, Judge Richey's proposal does not require the court making a finding in front of the jury, but only requires the jury be given an instruction regarding the opinion testimony. *See also People v. Lamont,* 21 A.D.3d 1129, 1132, 800 N.Y.S.2d 480 (N.Y.App.Div.2005) ("The court is not required to explicitly declare a witness an expert before permitting such testimony[.]").

In the instant case, and contrary to the dissent's contention that the jury was not given guidance to evaluate the testimony of Dr. Manoukian and Detective Ah Mow, *see* dissent at 246–47, 297 P.3d at 1102–03, the jury was given an instruction on the opinion testimony.

12. However, the ICA also noted that the concerns raised by Judge Richey could be addressed by other means, such as "giving cautionary instructions to the jury regarding the weight to be given to testimony by expert witnesses." *Id.* at 155, 194 P.3d at 1117.

13. The fact that the court gave the State's requested instruction, which was "modified to eliminate use of [the] word 'expert[,]' " lends some support to the State's assertion. *See infra* part III(C) of this opinion. However, in the future, trial courts adopting this approach should ensure that such a decision is reflected on the record to facilitate appellate review.

14. In addition, federal courts have held that a court's failure to formally qualify a witness as an expert is harmless error if the record establishes that the witness would have been qualified as an expert under the Federal Rules of Evidence (FRE) Rule 702. *See, e.g., United States v. Mendoza,* 244 F.3d 1037, 1046–47 (9th Cir.2001) (assuming arguendo that the district court erred in admitting testimony as the opinion of a percipient witness when it was expert opinion, such error was harmless because the record showed that the witness could have been qualified as an expert under FRE Rule 702); *United States v. Figueroa–Lopez,* 125 F.3d 1241, 1247 (9th Cir.1997); *United States v. Ramsey,* 165 F.3d 980, 984 (D.C.Cir.1999) (concluding that there was no plain error, where, "[a]lthough the trial judge never formally qualified [the witness] as an expert witness, his testimony functionally satisfied the requirements for expert testimony set forth in [FRE] 702"). Because the Hawai'i rules are patterned after the federal rules, *see State v. Ito,*

dation would also assist the jury in determining the weight to be given to the witness's testimony. *See* Commentary to HRE Rule 702 ("The trier of fact may nonetheless consider the qualifications of the witness in determining the weight to be given to his testimony.").

█ Here, Dr. Manoukian's and Detective Ah Mow's testimony satisfied the foundational requirements for expert testimony set forth in HRE Rule 702. In order to provide expert testimony under HRE Rule 702:(1) the witness must be qualified by knowledge, skill, experience, training or education; (2) the testimony must have the capacity to assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the expert's analysis must meet a threshold level of reliability and trustworthiness. *See State v. Torres* (*Torres* I), 122 Hawai'i 2, 31, 222 P.3d 409, 438 (App.2009) (citations omitted), *affirmed and corrected on other grounds by, State v. Torres* (*Torres II*), 125 Hawai'i 382, 262 P.3d 1006 (2011). This court has noted:

> The reliability requirement refers to <u>evidentiary</u> reliability—that is trustworthiness. Under this prong, admission of expert evidence is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his or her discipline. In this context, the trial court is assigned the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.

*Torres I*, 122 Hawai'i at 31, 222 P.3d at 438 (citation omitted) (emphasis in original).

In this case, both Dr. Manoukian and Detective Ah Mow were qualified by "knowledge, skill, experience, training, or education" to provide the testimony that Metcalfe now challenges, and their testimo-

ny had "a reliable basis in the knowledge and experience" of their respective disciplines.[15] *See id.*

### 1. Dr. Manoukian

█ Dr. Manoukian testified inter alia that: he is employed as a pathologist and serves as the laboratory director at Maui Memorial Medical Center; he is the coroner's physician for the County of Maui, Hawai'i County and the County of Kaua'i; he is a physician and surgeon licensed in the State of Hawai'i; he is certified by the American Board of Pathology in anatomic and clinical pathology and forensic pathology; he has performed over 3,000 autopsies; he has observed in excess of a hundred cases in which the cause of death was injury caused by a firearm; he has received ballistics training with the Maryland State Crime Lab; and he has had autopsy training with respect to death due to firearms. Accordingly, Dr. Manoukian was qualified by "knowledge, skill, experience, training, or education," to testify that Kuahuia's death was caused by a shotgun injury to the back at a distance of approximately 60 feet.

Nevertheless, Metcalfe, citing *Torres I*, specifically challenges Dr. Manoukian's qualifications, on the ground that Dr. Manoukian acknowledged "I'm not a firearms or a ballistic expert." In *Torres I*, the ICA vacated Torres's murder conviction on the ground that the circuit court erred in admitting opinion testimony that the defendant's gun had been fired within a specific time frame.[16] 122 Hawai'i at 6, 222 P.3d at 413. The ICA noted that the opinion testimony was "particularly significant" because, "[i]f the gun had been fired outside this time frame, it could not have been used to murder [the decedent]." *Id.* at 26, 222 P.3d at 433.

---

90 Hawai'i 225, 236, 978 P.2d 191, 202 (App. 1999), federal cases are instructive.

**15.** Although not disputed, we note that the testimony of Dr. Manoukian and Detective Ah Mow also had the capacity to "assist the trier of fact to understand the evidence or to determine a fact in issue" because the testimony was relevant to rebut Metcalfe's theory of self-defense and his claim that he shot at Kuahuia as Kuahuia charged toward him.

**16.** In *Torres II*, this court did not revisit the ICA's analysis of the evidentiary issue, but instead addressed a separate issue as to whether both federal law and the Hawai'i Constitution should have been considered in ruling on the defendant's motion to dismiss. *Torres II*, 125 Hawai'i at 400, 262 P.3d at 1024. This court affirmed the ICA's judgment, as corrected by the ruling in *Torres II*.

The opinion witness, Agent Robbins, inspected the gun that had been seized from the defendant. *Id.* at 27, 222 P.3d at 434. Agent Robbins testified over objection that he believed the gun had been recently fired, based on his examination of the gun. *Id.* Specifically, Agent Robbins testified that powder residue characteristic of a fired revolver was present in the barrel and appeared to be moist. *Id.* Agent Robbins' "experience indicate[d] that powder residue tends to dry out after a period of time." *Id.* Agent Robbins also testified that powder residue changes color with age, and will change to a "rust color." *Id.* However, the powder residue in the gun Agent Robbins examined was "fresh and black gray." *Id.* Upon further questioning, Agent Robbins opined that gun had been fired "within the same day, probably about eight hours or so[,]" based on "the moistness of the powder residue and the fact that the weapon had no indication of rust." *Id.* (brackets omitted).

Agent Robbins had "significant experience in the use and maintenance of firearms." *Id.* at 26, 222 P.3d at 433. However, on cross-examination, he acknowledged that his opinion was based on his "personal experience handling firearms" and not on any scientific or comparison studies. *Id.* at 27, 222 P.3d at 434. He further acknowledged, "I'm not an expert—I have no knowledge of a scientific test that would determine that." *Id.* at 28, 222 P.3d at 435.

The ICA concluded that Agent Robbins' testimony did not constitute lay opinion testimony because the State did not establish that his opinions as to the time frame were "rationally based on his perception or his personal knowledge." *Id.* at 29, 222 P.3d at 436. Specifically, the State did not establish that "Agent Robbins had personal knowledge of the moisture content or appearance of gunpowder residue in a revolver at various times after the gun had been fired." *Id.*

Additionally, the ICA concluded that the State failed to "satisfy the threshold foundational requirement of showing that Agent Robbins was qualified as an expert[.]" *Id.* at 31, 222 P.3d at 438. The ICA concluded:

> The State failed to satisfy the threshold foundational requirement of showing that Agent Robbins qualified as an expert by knowledge, skill, experience, training, or

education with respect to the time-frame testimony. Indeed, Agent Robbins readily acknowledged that he was not an expert in the field of firearms analysis or in how to determine the time frame in which a gun had been fired. He admitted that he had not performed laboratory work or received special schooling in the analysis of firearms discharges and that he had never before testified as a firearms expert or rendered an opinion on whether a firearm had been recently fired.

> In addition, the State failed to adduce evidence demonstrating that Agent Robbins's time-frame testimony had a reliable basis in the knowledge and experience of his or her discipline and rests on a reliable foundation. Agent Robbins stated that he was not aware of any test that could determine the time frame in which a gun had been fired and did not know how to determine the age of gunpowder residue, even though his time-frame testimony was principally based on the moistness of the power residue. Agent Robbins further acknowledged that his time-frame testimony was not based on any scientific studies. We have not been cited any authority verifying that the observations made by Agent Robbins would provide a reliable basis for determining the time frame in which a gun had previously been fired.

*Id.* (internal quotation marks and citations omitted).

The ICA further concluded that the erroneous admission of Agent Robbins' testimony was not harmless beyond a reasonable doubt. *Id.* Accordingly, the ICA vacated the defendant's conviction. *Id.* at 34, 222 P.3d at 441.

The instant case is distinguishable from *Torres I.* Here, the record establishes that Dr. Manoukian was capable of concluding that Kuahuia's cause of death was a shotgun injury to the back at a distance of approximately 60 feet, and that this conclusion had "a reliable basis in the knowledge and experience of [Dr. Manoukian's] discipline and rests on a reliable foundation." *See id.* at 31, 222 P.3d at 438. Dr. Manoukian, a trained, licensed, and certified forensic pathologist, stated that the formula he used to determine the distance from the shotgun to the decedent was taken from "textbooks of forensic pathology" whereby the "diameter of the pel-

let injury times three equals ... the [approximate] distance in feet between the decedent and the shotgun." Metcalfe never objected to Dr. Manoukian's distance formula at trial. Dr. Manoukian has observed in excess of a hundred cases in which the cause of death was injury caused by a firearm, of the over 3,000 autopsies that he performed as coroner's physician for the Counties of Maui, Hawai'i, and Kauaai. He has also received ballistic and firearm related autopsy training. These facts establish that Dr. Manoukian has sufficient "knowledge, skill, experience, training or education[,]" *see Nielsen v. American Honda Motor Co., Inc.,* 92 Hawai'i 180, 188, 989 P.2d 264, 272 (App.1999), to determine Kuahuia's cause of death and the approximate distance of Kuahuia from the shotgun at the time it was fired. Thus, his testimony meets the foundational requirements of HRE Rule 702 and was properly allowed by the circuit court.

Moreover, Agent Robbins' admission in *Torres I* that he was not an expert was not the sole factor the ICA relied on in concluding that his opinion testimony was inadmissible. Rather, as noted *supra*, the ICA focused extensively on Agent Robbins' lack of training or experience in determining when a firearm had been fired. *Id.* at 31, 222 P.3d at 438. In contrast, here, the record establishes that Dr. Manoukian was qualified to conclude that Kuahuia's cause of death was a shotgun injury to the back at a distance of approximately 60 feet. Thus, Metcalfe's argument that Dr. Manoukian's testimony was inadmissible under *Torres I*, because he acknowledged "I'm not a firearms or a ballistic expert" is without merit.

### 2. Detective Ah Mow

■ Similarly, the State established Detective Ah Mow's qualifications to testify regarding the pattern tests performed with the shotgun recovered during the investigation. Detective Ah Mow testified that he is a certified firearms instructor for the HCPD; he has been an instructor with the Special Response Team (SRT); he is certified regarding firearms by the FBI and the National Rifle Association; and he has received shot-

gun training by the FBI. This testimony established that he had the requisite "skill, knowledge, experience, training or education" with the use, identification, and operation of shotguns to testify regarding the pattern tests. Detective Ah Mow also provided additional testimony regarding his knowledge of firearms. For example, he testified that a "choke" may be located at the end of the barrel of a shotgun and measures the "rate of the spread pattern that goes out of the shotgun as it reaches its target." He testified that the shotgun recovered in this case did not have a choke, but noted that a choke "definitely would ... affect the spread pattern."

■ Detective Ah Mow's knowledge of firearms was also sufficient to establish that his testimony regarding the tests he conducted had "a reliable basis in the knowledge and experience of [his] discipline and rest[ ] on a reliable foundation." *See Torres I* at 31, 222 P.3d at 438. The pattern tests he performed involved firing the shotgun recovered during the investigation and ammunition identical to that recovered from Metcalfe's home at eight standard police silhouette targets, which were placed at various distances. Detective Ah Mow testified as to what he observed on each of the silhouettes after they were fired upon. Thus, Detective Ah Mow's testimony was limited to establishing the effect of firing distance on the spread pattern of shotgun pellets. His expertise in the use and operation of firearms was sufficient, in this instance, to meet the foundational requirements of HRE Rule 702.

■ Thus, Detective Ah Mow's testimony is also distinguishable from that presented in *Torres I*. There, Agent Robbins "had not performed laboratory work or received special schooling" in the analysis of residue found in a firearm. *Torres I*, 122 Hawai'i at 31, 222 P.3d at 438. In addition, he was not aware of any test that would confirm his opinion as to when the gun had been fired. *Id.* In contrast, here, the test that Detective Ah Mow performed did not involve specialized technical expertise beyond the scope of his knowledge concerning the operation of shotguns.[17]

---

**17.** Contrary to the dissent's assertion, there is nothing that requires an expert to use a "scienti-

fic test." Dissent at 242, 297 P.3d at 1098. HRE Rule 702 merely requires the court to con-

Accordingly, the testimony of Dr. Manoukian and Detective Ah Mow was properly received as expert testimony under HRE Rule 702 because: (1) their testimony evidenced that they were qualified by skill, knowledge, experience, training or education; (2) their testimony had the capacity to assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) their analysis met a threshold level of reliability and trustworthiness.[18] *See Torres I*, 122 Hawai'i at 31, 222 P.3d at 438. Finally, we note that it is unclear what effect these witnesses' testimony with regard to distance may have had, given that the appearance of gunshot wounds only on Kuahuia's back substantially undermined Metcalfe's theory of self-defense.

**C. The circuit court's substitution of the words "opinion testimony" for the word "expert" in its jury instructions did not constitute plain error because the given instructions as a whole accurately stated the law**

■ Although Metcalfe did not object to the "opinion testimony" instruction at trial, he argues on appeal that the standard jury instruction on expert testimony was erroneously modified by the circuit court's substitution of the words "opinion testimony" for the word "expert," and that the instruction improperly blended HRE Rules 701 and 702. This argument is without merit because the "opinion testimony" instruction accurately stated the law.

■ "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read

and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *Nichols*, 111 Hawai'i at 334, 141 P.3d at 981. The failure to strictly conform to a Hawai'i Standard Jury Instruction Criminal (HAWJIC) standard jury instruction "does not automatically result in an incomplete and confusing jury instruction." *State v. Sawyer*, 88 Hawai'i 325, 335, 966 P.2d 637, 647 (1998). Furthermore, "[t]he trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case." *Id.* at 330, 966 P.2d at 642.

The circuit court gave the following instructions on opinion testimony:

During the trial you heard testimony of one or more witnesses who were <u>allowed to give opinion testimony</u>.

Training and experience may make a person <u>qualified to give opinion testimony</u> in a particular field. The law allows that person to state an opinion about matters in the field. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. It is up to you to decide whether to accept this testimony and how much weight to give it. You must also decide whether the witness's opinions were based on sound reason, judgment and information.

(Emphasis added).

HAWJIC 4.05 (Dec. 1991), concerning expert witnesses, states:

---

sider the "trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert." Additionally, in *Torres I*, the only mention of "scientific test" was from Agent Robbins' testimony that he had "no knowledge of a scientific test that would determine" when a gun was fired. 122 Hawai'i at 27–28, 222 P.3d at 434–35. *Torres I* does not, contrary to the dissent's implication, set forth a requirement that an expert use a "scientific test." *See* Dissent at 242 n. 9, 297 P.3d at 1098 n. 9.

Furthermore, in contrast to the dissent's conclusion that "only a ballistics expert could establish whether or not results from the test retained external validity when transferred to the crime scene[,]" dissent at 243, 297 P.3d at 1099, Detective Ah Mow did not testify to the ultimate issue in this case, i.e., he did not conclude at what

distance Metcalfe shot Kuahuia. Detective Ah Mow testified only that he conducted a test, which involved firing a shotgun under "ideal laboratory condition[s]" at eight targets placed at various distances. Although the prosecutor could draw reasonable inferences from the evidence during closing argument, *see State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996), the record is clear that Detective Ah Mow did not testify as to what he believed was the distance between Metcalfe and Kuahuia when the latter was shot in the back.

18. Given our conclusion, we need not address, as the dissent does, the State's argument that it was a "legitimate trial tactic" for Metcalfe not to object to the qualifications of Dr. Manoukian and Detective Ah Mow. *See* Dissent at 248, 297 P.3d at 1104.

During the trial you heard the testimony of one or more witnesses who were described as experts.

Training and experience may make a person an expert in a particular field. The law allows that person to state an opinion about matters in that field. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. It is up to you to decide whether to accept this testimony and how much weight to give it. You must also decide whether the witness's opinions were based on sound reasons, judgment and information.

(Emphasis added).

The only difference between the instructions given and HAWJIC 4.05 is that the circuit court used the phrase "allowed to give opinion testimony" instead of the phrase "described as experts" in the first paragraph and used the phrase "qualified to give opinion testimony" instead of the phrase "an expert" in the second paragraph. The substituted phrases did not materially alter the instruction, inasmuch as the jury was still informed that it needed to decide whether to accept the testimony of these individuals and to determine how much weight to give to this testimony.

The instructions were not erroneous because they provided the jurors with understandable guidelines to assist them in evaluating expert testimony admitted pursuant to HRE Rule 702 in the circumstances of this case. As previously discussed, the testimony of Dr. Manoukian and Detective Ah Mow was proper expert testimony under HRE Rule 702. The jury was informed that it needed to determine whether it would accept the testimony, the weight to give the testimony, and "whether the witnesses's opinions were based on sound reasons, judgment, and information." Because the trial court is not required to strictly conform to a standard jury

instruction and because the instructions, as a whole, accurately stated factors for the jury to consider in evaluating expert testimony admitted under HRE Rule 702, the circuit court did not plainly err in giving the instructions.

**D. The circuit court did not plainly err in instructing the jury on self-defense**

Although Metcalfe did not object to the self-defense instruction given at trial, he asserts on appeal that the self-defense instruction was "incomplete, misleading, and contributed to [his] conviction." Specifically, Metcalfe argues that: (1) this court's decision in *State v. Van Dyke*, 101 Hawai'i 377, 379–88, 69 P.3d 88, 90–99 (2003), was applicable to this case; (2) the omission of the definition of "confinement" constituted error; (3) the self-defense instruction along with the ICA's decision in *State v. Lubong*, 77 Hawai'i 429, 886 P.2d 766 (App.1994), erroneously uses the phrase "reasonably prudent person" as opposed to "reasonable person"; (4) further clarification of the subjective test was necessary; and (5) the *Lubong* portion of the instructions did not specify that the State had a duty to disprove self-defense beyond a reasonable doubt. As discussed below, Metcalfe's contentions are without merit.

First, Metcalfe asserts that, under *Van Dyke*, the self-defense instruction should have "first require[d] the jury to determine the degree of force, i.e. 'force' or 'deadly force[.]' "[19] However, *Van Dyke* does not stand for this proposition. There, the defendant, Montez, was charged with the murder of Henry Paoa after an incident wherein the two men engaged in a physical altercation. *Van Dyke*, 101 Hawai'i at 379–81, 69 P.3d at 90–92. During the altercation, Montez subdued Paoa by "thrust[ing]" his head into the ground. *Id.* at 380, 69 P.3d at 91. At trial, Montez asserted self-defense. *Id.* at 384, 69

---

**19.** In footnote 5 of his application, Metcalfe points out that this court has "since repealed the standard self-defense instruction in effect at the time of [Metcalfe's] trial" and that the instruction now requires the jury to first determine whether "force" or "deadly force" was used. However, the amendment does not appear to reflect a change in the substantive law regarding self-defense, but instead appears to provide the jury with more specific instructions, depending on

whether "force" or "deadly force" is at issue. In any event, the HAWJIC are not law, and a court is not bound by the standard jury instruction. *See* HAWJIC introduction (noting that "the Hawai'i Supreme Court has not approved the substance of any of the pattern instructions"); *State v. Toro*, 77 Hawai'i 340, 348, 884 P.2d 403, 411 (App.1994) (noting that circuit courts are not required to give standard jury instructions).

P.3d at 95. The jury was instructed on the justifiable use of "deadly force," but was not instructed on the justifiable use of "force," even though the defendant expressly disputed whether his use of force constituted "deadly force." *Id.* at 387, 69 P.3d at 98. The defendant was subsequently found guilty. *Id.* On appeal, this court determined that the circuit court erred in failing to instruct the jury on the use of "force," in addition to the use of "deadly force." *Id.* at 387–88, 69 P.3d at 98–99. In contrast, here, the jury was instructed on both "force" and "deadly force." *Van Dyke* did not hold that the jury must first determine which kind of force was used, and Metcalfe's reliance on *Van Dyke* is therefore misplaced.

■■■ Second, Metcalfe appears to argue that the circuit court should have instructed the jury regarding the relationship between "confinement" and self-defense pursuant to HRS § 703–304(6). HRS § 703–304(6) provides, "The justification afforded by this section extends to the use of confinement as protective force only if the actor takes all reasonable measures to terminate the confinement as soon as he knows that he safely can, unless the person confined has been arrested on a charge of crime." Metcalfe appears to argue that he used protective force in confining Kuahuia by telling him to get on the ground and, the "jury could have prematurely concluded that self-defense did not apply" because there was no instruction on confinement. However, the use of confinement as protective force is not applicable in this case. Metcalfe was not charged with assault for confining Kuahuia to the ground, for which an instruction regarding confinement may be warranted, but rather was charged with murder in the second degree for firing a shotgun at Kuahuia resulting in Kuahuia's death. The State did not rely at trial on a theory that Metcalfe unlawfully confined Kuahuia, and thus, it was not plain error to fail to sua sponte instruct the jury on confinement.

■■■ Metcalfe then challenges the portion of the self-defense instruction given to the jury that was based on *Lubong.* In *Lubong,* the ICA articulated a two-prong framework for assessing a defendant's claim of self-defense:

The first prong is subjective; it requires a determination of whether the defendant had the requisite belief that deadly force was necessary to avert death, serious bodily injury, kidnapping, rape, or forcible sodomy.

. . . .

If the State does not prove beyond a reasonable doubt that the defendant did not have the requisite belief that deadly force was necessary, the factfinder must then proceed to the second prong of the test. This prong is objective; it requires a determination of whether a reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection.

77 Hawai'i at 433, 886 P.2d at 770 (citation omitted).

Thus, *Lubong* requires that the factfinder consider whether the use of force was both subjectively necessary and objectively reasonable to determine if self-defense is applicable. This court expressly approved of the language used in *Lubong* in *State v. Culkin,* 97 Hawai'i 206, 215, 35 P.3d 233, 242 (2001).

Metcalfe argues that the omission of language to explain the subjective portion of self-defense made the instruction in this case incomplete and misleading. In regard to the subjective prong of self-defense, the jury was instructed:

For this part of the test, you should place yourself in the shoes of the defendant. If you find that Defendant did not have the subjective belief that the force he used was immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person, as set forth above, then the State has disproven the defense of self defense. If the State has not disproven Defendant's subjective belief, then you should go on the second part of the test [sic].

Metcalfe asserts that the court should have explained that the jury must "determine the point of view which the defendant had at the time of the incident, and view the conduct of the [decedent] with all its pertinent sidelights as the defendant was warranted in viewing it." (Quoting *Lubong,* 77 Hawai'i at 433, 886

P.2d at 770). Metcalfe's argument is without merit. Here, the jury was instructed that, with regard to the subjective part of the self-defense test,

> you should place yourself in the shoes of the defendant. If you find that Defendant did not have the subjective belief that the force he used was immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person, as set forth above, then the State has disproven the defense of self defense. If the State has not disproven Defendant's subjective belief, then you should go on the second part of the test [sic].

(Emphasis added).

*Lubong* requires the jury to "determine the point of view which the defendant had at the time of the incident"; similarly, in the present case, the jury was instructed to "place yourself in the shoes of the defendant." *Lubong* also provides that the jury view the conduct of the decedent with "all its pertinent sidelights as the defendant was warranted in viewing it"; here, the jury was told to assess Metcalfe's "subjective belief." "Subjective" is commonly understood as "[b]ased on an individual's perceptions, feelings, or intentions, as opposed to externally verifiable phenomena[.]" *Black's Law Dictionary* 1561 (9th ed. 2009). Accordingly, reading the instructions as a whole, the omission of the specific language of *Lubong* was not necessary to further explain the subjective test.

▮ Metcalfe also asserts that the objective portion of the self-defense instruction was erroneous and misleading. The jury was instructed:

> Secondly, you should determine whether a reasonably prudent person in the same situation as the Defendant would have believed that the force used was necessary against the use of unlawful force. If the State has shown that a reasonably prudent person in the same situation as the defendant would not have believed that the force was so necessary, then you must reject the defense of self defense.

(Emphasis added).

Metcalfe asserts that the circuit court's substitution of "reasonably prudent person" for "reasonable person" "created a higher standard than what was actually required under that statute[.]" In *Lubong,* the ICA held that the defense of self-defense requires an objective determination as to whether a "reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection." 77 Hawai'i at 433, 886 P.2d at 770. Metcalfe attempts to distinguish "reasonable person" as provided in HRS § 703–304 and "reasonably prudent person" by citing to the definition of "prudent" as "[h]andling practical matters judiciously[,]" "[m]anaging carefully[,]" and "[b]ehaving circumspectly[.]" His attempt to distinguish "reasonable person" from "reasonably prudent person" is without merit because the terms are interchangeable and a reasonable juror would not believe there was a difference between the two terms. *See Black's Law Dictionary* 1380–81 (9th ed. 2009) (noting that "reasonable person" is "[a]lso termed ... reasonably prudent person[.]"). Moreover, Metcalfe presents no further argument in support of overturning *Culkin* or *Lubong.* Accordingly, instructing the jury that it should assess Metcalfe's claim of self-defense from the standpoint of a "reasonably prudent person" was not plainly erroneous.

▮ Finally, Metcalfe asserts that the *Lubong* portion of the instruction failed to provide that the State must disprove self-defense "beyond a reasonable doubt," even though he acknowledges that, when viewed as a whole, other portions of the self-defense instruction contained the correct standard. Metcalfe's argument is unpersuasive. As Metcalfe acknowledges, immediately preceding the *Lubong* portion of the self-defense instruction, the jury received an instruction as to the burden of the State:

> Justifiable use of force, commonly known as self defense is a defense to the charge of Murder in the Second Degree and Manslaughter. Once there is any evidence of justification, the burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable. If the prosecution does not meet this burden then you must

find the Defendant Not Guilty of Murder in the Second Degree and Manslaughter. (Emphasis added).

Thus, the circuit court was not required to again instruct the jury of this burden in the *Lubong* portion of the instruction.

Accordingly, the given instructions on self-defense, when considered as a whole, were not "prejudicially insufficient, erroneous, inconsistent, or misleading[.]" *Nichols*, 111 Hawai'i at 334, 141 P.3d at 981.

### E. The circuit court did not plainly err in failing to sua sponte instruct the jury on defense of property

■ Metcalfe contends that he was "entitled" to a defense of property instruction, pursuant to *State v. Stenger*, 122 Hawai'i 271, 281, 226 P.3d 441, 451 (2010), because there was "evidence, no matter how weak" that supported the jury's consideration of the defense of property. Metcalfe's argument lacks merit because there was no evidence that the charged offense was committed to defend Metcalfe's property.

Metcalfe argues that he was defending his property up until the time that Kuahuia began approaching him, and accordingly, the jury should have been instructed on defense of property. However, Metcalfe was not charged with an offense for the events leading up to Kuahuia approaching Metcalfe. Here, Metcalfe was charged with Murder in the Second Degree for allegedly shooting Kuahuia after Kuahuia approached him, and his sole defense against the charge was self-defense.

Moreover, there is nothing in the record to indicate that Metcalfe fired the shotgun to protect his property. To the contrary, Metcalfe expressly denied firing the shotgun to protect his property and instead testified that, as Kuahuia attacked him, he fired three shots because he was "scared to death" and was "thinking about [him]self." In addition, during closing arguments, defense counsel argued "make no mistake[,] [t]his case is not about defense of property" and "[Metcalfe] shot [Kuahuia] because he charged him. He charged him with something that could have slit his throat. That's—that's what this case is really all about. This case is about self-defense." Thus, a defense of property in-

struction would have been contrary to the defense's theory of the case, i.e., that Metcalfe fired the shotgun at Kuahuia in self-defense. Furthermore, inclusion of a defense of property instruction may actually have prejudiced Metcalfe inasmuch as it could have misled or confused the jury into thinking that Metcalfe fired the shots at Kuahuia only to defend his property, which would undermine Metcalfe's theory of self-defense. Accordingly, the circuit court did not plainly err for failing to sua sponte instruct the jury regarding defense of property.

### F. The circuit court did not plainly err in failing to provide a cautionary instruction on the use of "medical marijuana"

■ Metcalfe argues that the circuit court erred in failing to sua sponte give a cautionary instruction regarding references during testimony and closing arguments to "medical marijuana" because "there is a reasonable probability that the repetitive and sustained emphasis on the medical marijuana ... contributed to [Metcalfe's] conviction[.]" However, Metcalfe does not provide any authority that requires the circuit court to sua sponte provide the jury with a cautionary instruction on the use of medical marijuana.

Moreover, Metcalfe's argument is without merit because the testimony adduced at trial did not prejudice Metcalfe. Jordan testified that he, Metcalfe, and Meech, had medical marijuana permits, and that on May 6, 2009, he had smoked a "small amount" that did not affect his memory of the events of that day. Officer Smith testified that he could smell marijuana, but could not tell if it was coming from Metcalfe. Metcalfe acknowledged that he had a medical marijuana permit and that on the day of the incident he smoked "maybe a gram" of marijuana for his irritable bowel syndrome. The evidence introduced regarding medical marijuana indicated that Metcalfe had a permit to legally possess and use the medical marijuana, and that he used marijuana for medicinal purposes. Therefore, the absence of a cautionary instruction was not prejudicial. Accordingly, the circuit court did not plainly err in not sua sponte provid-

ing a cautionary instruction on the use of medical marijuana.

## G. Metcalfe failed to establish that his trial counsel was ineffective

Metcalfe contends that his trial counsel was ineffective for the following reasons: (1) failing to "adequately frame the legal challenge to the State's re-filing of the charge by way of preliminary hearing after the grand jury returned a 'no bill' " and failing to introduce the grand jury and preliminary hearing transcripts; (2) failing to object to the testimony of Dr. Manoukian and Detective Ah Mow, and to the modified expert opinion instruction; (3) disavowing the defense of property in closing argument and not requesting a defense of property instruction; (4) failing to object to testimony or request a cautionary instruction regarding the medical marijuana; (5) failing to object to the admission of numerous physical items; (6) eliciting expert ballistics testimony from a lay police officer witness on cross-examination, in violation of HRE Rules 701 and 702, that was harmful to Metcalfe because it "resulted in the 'firearm' element possibly being proved"; (7) failing to object to the measurements from the "Total Station Device," which was allegedly not properly calibrated or in proper working order; and (8) failing to develop Dr. Manoukian's testimony on the potential gunshot residue. As discussed below, Metcalfe's claims are without merit.

To succeed on his claim of ineffective assistance of counsel, Metcalfe must show that "there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence" and that "such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Wakisaka,* 102 Hawai'i at 514, 78 P.3d at 327 (citation omitted).

First, Metcalfe argues that his trial counsel was ineffective in arguing in his motion to dismiss that the State's re-filing of the complaint was barred by double jeopardy and collateral estoppel. Metcalfe asserts that the issue instead should have been framed as "prosecutorial misconduct, impropriety, and bad faith" because the prosecutor failed to provide exculpatory evidence at the preliminary hearing. However, the record is insufficient to establish that Metcalfe's trial counsel was ineffective in this respect, because there is nothing in the record to indicate that the State failed to present exculpatory evidence at the preliminary hearing.

In *State v. Hall,* this court determined that the State must present the grand jury with evidence that is "clearly exculpatory." 66 Haw. 300, 302, 660 P.2d 33, 34 (1983). It appears that this court has not yet considered whether to extend this requirement to preliminary hearings. However, assuming that the "clearly exculpatory" requirement applies, the record is insufficient to determine whether the State failed to present "clearly exculpatory" evidence at the preliminary hearing, because the grand jury and preliminary hearing transcripts are not contained in the record on appeal. Moreover, Metcalfe does not present any argument as to the nature of the exculpatory evidence that the State allegedly failed to present.

Metcalfe also argues that his trial counsel was ineffective in failing to present the grand jury and preliminary hearing transcripts to the circuit court with his motion to dismiss. Again, however, there is nothing in the record to establish that the failure to admit the transcripts "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *See Wakisaka,* 102 Hawai'i at 514, 78 P.3d at 327 (citation omitted). Without the transcripts in the record, it is not clear that the transcripts would have supported Metcalfe's assertion that the State failed to present exculpatory evidence at the preliminary hearing. It therefore would appear that Metcalfe's arguments could properly be raised in a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 Petition, which would allow Metcalfe to bring the transcripts of the grand jury and preliminary hearings, as well as trial counsel's reasons for failing to include those transcripts in the record, before the trial court to support his claim of ineffective assistance of counsel. *See Fields,* 115 Hawai'i at 529 n. 17, 168 P.3d at 981 n. 17 ("[W]e believe that deciding the issue at the present time, without affording the parties the benefit of argument and the opportunity to present a complete record, is inappropriate.") (emphasis added).

Second, Metcalfe asserts that his trial counsel was ineffective for failing to object to the testimony of Dr. Manoukian and Detective Ah Mow, and for failing to object to the modified "expert" opinion instruction. As discussed *supra*, however, both Dr. Manoukian and Detective Ah Mow had the requisite "knowledge, skill, experience, training or education" to offer an opinion on "scientific, technical, or other specialized knowledge[,]" as required in HRE Rule 702. Moreover, Metcalfe used the testimony of Dr. Manoukian and Detective Ah Mow to establish his theory of the case, i.e., that Kuahuia was shot from a close distance. In addition, the given jury instruction regarding the opinion testimony was not erroneous because it provided the jurors with understandable guidelines to assist them in evaluating the testimony of Dr. Manoukian and Detective Ah Mow. Because the testimony and instruction were proper, trial counsel's failure to object did not result in the "withdrawal or substantial impairment of a potentially meritorious defense." *See Wakisaka*, 102 Hawai'i at 514, 78 P.3d at 327. Accordingly, trial counsel was not ineffective for failing to object to the testimony of Dr. Manoukian and Detective Ah Mow or for failing to object to the instruction on the opinion testimony.

Third, Metcalfe asserts that his trial counsel was ineffective for disavowing the defense of property and not requesting a defense of property instruction. As discussed *supra*, a defense of property instruction was not warranted and could have undermined Metcalfe's theory of the case, i.e., that he fired the shotgun in self-defense. Thus, it was not ineffective for Metcalfe's trial counsel to disavow defense of property and to not request a defense of property instruction. *See Briones*, 74 Haw. at 462–63, 848 P.2d at 976 ("Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny.").

Fourth, Metcalfe argues that his trial counsel was ineffective for failing to: (1) object to the questioning of witnesses, including Metcalfe, about medical marijuana; (2) object to the testimony of Officer Smith about being a drug recognition expert and his opinion as to whether Metcalfe was under the influence of marijuana; (3) object to the State's Exhibit 76, which was a photograph of the inside of Metcalfe's greenhouse containing Metcalfe's medical marijuana plants; and (4) request a cautionary instruction on the admission of the medical marijuana evidence.

With regard to the questioning of witnesses and Metcalfe about the medical marijuana, Metcalfe argues that the testimony was irrelevant and more prejudicial than probative. However, as discussed *supra*, the testimony elicited regarding medical marijuana usage was not prejudicial. In addition, questioning about the medical marijuana was relevant to determining Jordan's and Metcalfe's perception of the events and their ability to remember what occurred.

With regard to Officer Smith's testimony, Metcalfe does not state the objection that should have been raised. Thus, this argument may be deemed waived. HRAP Rule 40.1(d)(4) ("The application ... shall contain ... [a] brief argument with supporting authorities.") (emphasis added). In addition, Officer Smith's testimony was relevant and probative of Metcalfe's perception and ability to recall the incident.

 In regard to the photograph of Metcalfe's medical marijuana plants, Detective Bird stated that the photograph accurately depicted the scene at the time the photograph was taken and that the plants in the photograph looked like marijuana plants, but she "didn't test 'em[.]" Any error in admission of the photograph was harmless because Metcalfe testified that he had a permit for ten medical marijuana plants that were in his greenhouse, and thus, evidence regarding the marijuana plants was not unduly prejudicial.

With regard to the failure to request a cautionary instruction on medical marijuana, as discussed *supra* part III(E) of this opinion, a cautionary instruction was not necessary, and thus, there was no withdrawal or substantial impairment of a meritorious defense in failing to request such an instruction. Accordingly, Metcalfe's trial counsel was not ineffective for failing to object to the medical marijuana testimony and photograph.

Fifth, Metcalfe asserts that his trial counsel was ineffective for failing to object to numerous physical items "for which no authentication or relevance was established[.]" Specifically, Metcalfe cross-references his opening brief and challenges the admission of a blue tank top, blue pants, light blue shorts, a firearm, 22 unspent Winchester 12–gauge shotgun shells, a hacksaw, a rubber slipper, three spent shotgun shells, and pellets recovered from different organs in Kuahuia's body. This argument may be disregarded because Metcalfe does not present any argument as to how trial counsel's failure to challenge the admission of the physical evidence detrimentally affected his defense. HRAP Rule 40.1(d)(4) ("The application ... shall contain ... [a] brief argument with supporting authorities.") (emphasis added). Moreover, it appears that Metcalfe relied on some of the physical evidence to support his defense. For example, during closing argument, Metcalfe argued that he "subjectively believed that his life was in danger" because Kuahuia was holding the hacksaw recovered at the scene, which was entered into evidence by the State without objection by defense counsel. Accordingly, trial counsel's decision to not object to the admission of these items had an "obvious tactical basis" that benefitted Metcalfe's case. *Briones,* 74 Haw. at 462–63, 848 P.2d at 976 ("Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny."). Accordingly, trial counsel's decision to not object to the admission of the physical evidence "will not be subject to further scrutiny." *Briones,* 74 Haw. at 462–63, 848 P.2d at 976.

 Sixth, Metcalfe asserts that trial counsel's cross-examination of Officer Smith regarding the shotgun "resulted in the withdrawal of the potentially meritorious defense of insufficient evidence of the 'firearm' element." Officer Smith testified on cross-examination about the mechanism of a shotgun, the differences between varying shotgun shells, and his prior experience hunting and shooting with a number 6 birdshot ammunition. Metcalfe's argument lacks merit because there was sufficient evidence of the firearm element without the testimony of Officer Smith, specifically through the testimony of Dr. Manoukian, who stated that Kuahuia died due to "a shotgun wound to the back[,]" and Detective Ah Mow, who stated that a "Browning ... semi-automatic 12–gauge shotgun" was recovered during the investigation. HRS § 134–1 (1993) defines "firearm" as "any weapon, for which the operating force is an explosive, including but not limited to pistols, revolvers, rifles, shotguns, automatic firearms...." (Emphasis added). In addition, Metcalfe himself testified that there was a bright flash of light when he pulled the trigger and that he fired a "shotgun." Accordingly, Metcalfe was not denied a potentially meritorious defense.

 Seventh, Metcalfe's argument that his trial counsel was ineffective for failing to object to the measurements from the Total Station device is also without merit. Metcalfe asserts that the failure to object to the admission of the measurements resulted in "the substantial impairment of [Metcalfe's] self-defense." Specialist Wong testified that she was asked to take measurements of the scene, and she used a Total Station device to measure the distance between objects recovered from the scene, which "appear[ed] to be working as it should" and gave no indication that data recovered was wrong. On cross-examination, Specialist Wong testified that she did not know if the Total Station device used to measure the distance between multiple objects recovered from the scene had been calibrated. It appears that trial counsel made a strategic decision to not object to the admission, but instead impeached the witness on cross-examination. *See Briones,* 74 Haw. at 462–63, 848 P.2d at 976 ("Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny."). In addition, it appears that Metcalfe relied upon one of the Total Station device's measurements to support his theory of the case. Specialist Wong testified that, using the Total Station, she measured the distance between a hacksaw and the closest shell casing as being approximately 47.8 feet. In closing arguments, Metcalfe, appearing to rely on the measurement between the shell casing and the hacksaw, argued that Kuahuia ran "47 feet" with the hacksaw before he dropped it. In sum, Metcalfe contended that Kuahuia had the hacksaw as he

tried to break into Metcalfe's greenhouse, charged Metcalfe while holding the hacksaw, and subsequently dropped the hacksaw 47 feet away from the greenhouse. Accordingly, trial counsel made a strategic decision to rely on one of the measurements obtained from the Total Station device to support his theory of the case. *See id.*

Assuming arguendo that the admission of the measurements was error, such error was harmless. In the instant case, there was other evidence concerning the distance between the casings and the hacksaw at the time of the shooting. Numerous photographs were entered into evidence by the State, without objection by the defendant at trial or on appeal, that accurately depicted the scene of the incident and generally depicted the distance between the hacksaw and the used shotgun shells. For example, State's Exhibit 86 depicts a view "from the top of [Metcalfe's] driveway looking down" towards the direction that Kuahuia's body was found, and shows two of the used shotgun shells and the small hacksaw at a further distance. Thus, assuming arguendo that the admission of the data from the Total Station device was error, it was harmless. Accordingly, Metcalfe does not show that the error resulted in the withdrawal or substantial impairment of a potentially meritorious defense.

Eighth, Metcalfe's assertion that his trial counsel was ineffective for failing to develop Dr. Manoukian's testimony as to whether there was gunshot residue on Kuahuia's hand lacks merit. On cross-examination, Detective Iwamoto stated that she could not recall if Dr. Manoukian performed a gunshot residue test, which involves performing a swab of the decedent's hand, to determine if Kuahuia had gunshot residue on his hand. Metcalfe uses trial counsel's questioning of Detective Iwamoto about whether gunshot residue was present on Kuahuia's hand as an opportunity to support his argument that Dr. Manoukian should have been similarly questioned about the presence of gunshot residue because "[t]he presence of gunshot residue on [Kuahuia's] hands would contradict the prosecution's theory that the shotgun was fired from a 60–foot distance[.]" There was no evidence adduced, however, that suggested that gunshot residue was indeed on Kuahuia's hand, and any cross-examination of Dr. Manoukian on this point would have been of limited value. Thus, Metcalfe fails to show that trial counsel's failure to question Dr. Manoukian about the gunshot residue impaired a potentially meritorious defense.

Accordingly, Metcalfe failed to establish that his trial counsel was ineffective.

## IV. Conclusion

For the reasons set forth in this opinion, we affirm the ICA's judgment on appeal, which affirmed the circuit court's March 25, 2010 judgment of conviction and sentence.

Dissenting Opinion by ACOBA, J., in which Circuit Judge SAKAMOTO, Assigned by Reason of Vacancy, joins.

In my view, Respondent/Plaintiff–Appellee State of Hawaiʻi (Respondent) failed to lay an adequate foundation to qualify either Dr. Anthony Manoukian (Dr. Manoukian) or Detective Walter Ah Mow (Ah Mow) as experts in the appropriate fields under the circumstances of this case, and, respectfully, the Circuit Court of the Third Circuit (the court) should have formally qualified both experts and established their areas of expertise on the record or in the jury instructions.[1] I believe that the court acted conscientiously. However, because the court did not qualify these witnesses, *see* Hawaiʻi Rules of Evidence (HRE) Rule 702,[2] and did not establish

---

1. The majority holds that "Dr. Manoukian's and [Ah Mow's] testimony satisfied the foundational requirements for expert testimony set forth in HRE Rule 702," Majority opinion at 227, 297 P.3d at 1083, and that "nothing in the HRE would preclude [the court] from declining to qualify a witness as an expert in front of the jury." *Id.* at 226, 297 P.3d at 1082.

2. HRE Rule 702 provides:

**Rule 702 Testimony by Experts.**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, <u>a witness qualified as an expert by knowledge, skill, experience, training, or education may testify</u> thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert. (Emphasis added.)

for the jury these witnesses' fields of expertise, *see id.*, the jury could not properly evaluate their testimony under the court's instruction on opinion testimony. Inasmuch as the testimony of these witnesses directly contradicted the testimony of Petitioner/ Defendant–Appellant Kevin C. Metcalfe (Petitioner), these errors substantially affected Petitioner's right to a fair trial and in my view constituted plain error. Therefore, I respectfully dissent.

### I.

### A.

Petitioner was charged with, *inter alia,* one count of Murder in the Second Degree Hawai'i Revised Statutes (HRS) § 707–701.5(1) (1993).[3] Petitioner testified to the following matters. At approximately 10:30 p.m. on May 6, 2009, an alarm and a video surveillance monitor indicated someone was on his property cutting through a shade cloth in the greenhouse. Petitioner approached the area with his shotgun, which was loaded with birdshot. He then confronted decedent Larry Kuahuia (Decedent) and told him that he had a gun and to "get on the ground." However, Decedent "was low to the ground" and "crab walked," towards Petitioner until he was five feet away from Petitioner. Decedent then "all at once just [ ] jumped towards [Petitioner]," and "hollered [ ] real loud." According to Petitioner, he then shot Decedent in self-defense.[4] However, Decedent continued to move towards Petitioner, who then "stepped back," and shot Decedent again.

In closing argument, Defense Counsel's explanation as to why Decedent was shot in the back was that Decedent was "down in that crab-walk position" and "charged" at Petitioner. Petitioner "stepped back" and "as he stepped back [Decedent] spun around to the left[,]" and Petitioner shot Decedent in his back "from a very close range." Defense Counsel also argued that "these shots were fired at a distance of probably [ten] to [fifteen] feet or less," because of the downward "slope" of the driveway after ten to fifteen feet, the straight angle of entry of the shots, the inability of the pellets to penetrate cardboard at sixty feet away, and there being a moving target and a moving shotgun.

### B.

In contrast, Respondent presented evidence seeking to show that Petitioner shot Decedent in the back and from a distance of approximately sixty feet. Dr. Manoukian testified that he was a "forensic pathologist" and a "coroner's physician" licensed in the State of Hawai'i.[5] He also related that he had "some specialized training in … ballistics[6] with the Maryland State Crime Lab." He had performed "in excess of 3,000" autopsies, including "in excess of a hundred" cases in which the cause of death was the result of an injury caused by a firearm. Dr. Manoukian testified that based on the diameter of the pellet injury, "the distance from the gun to [Decedent] [at the time of firing was] approximately [sixty] feet." When asked how he could calculate the approximate range of the distance between a gun and a victim of a gunshot wound, Dr. Manoukian cited to a "general rule of thumb" from "the textbooks of forensic pathology for a shotgun using birdshot[.]" However, under cross-examination, Dr. Manoukian admitted, "I'm not a firearms or a ballistic expert."

---

3. HRS § 707–701.5(1) (1993 Repl.) provides, in relevant part:
 (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

4. Petitioner was convicted of the lesser included offense of Manslaughter in violation of HRS § 707–702(1)(a) (Supp.2009), which provides:
 (1) A person commits the offense of manslaughter if:
 (a) The person recklessly causes the death of another person[.]

5. Dr. Manoukian further testified that a forensic pathologist uses "the general principles of [ ] pathology to [ ] determine through the study of human tissues and human fluids [ ] how someone was injured or how they died."

6. "Ballistics" is defined as (1) "[t]he science of the motion of projectiles, such as bullets," or (2) "the study of a weapon's firing characteristics, especially as used in criminal cases to determine a gun's firing capacity and whether a particular gun fired a given bullet." *Black's Law Dictionary* 163 (9th ed. 2009).

Ah Mow testified that he was a firearms instructor for the Criminal Investigative Section of the Hawaiʻi Police Department who had trained with the FBI on how to "conduct and view" basic shotgun training, including how to handle, maintain, and clean a weapon. Ah Mow related that his initial assignment in the investigation was to "be in charge of the scene" and "direc[t] our ... evidence specialist at the scene on the 7th of May[.]" However, he had later conducted a shotgun pattern test to "determine the distance of ... the shotgun as the pellets go through the barrel and make a spread pattern onto a target."

In closing argument, Respondent argued that Petitioner shot Decedent after "Decedent ran past him and down the driveway." According to Respondent "it [was] a straight-on shot in the back," and Decedent was "at least [forty] feet away from [Petitioner] while running down a driveway." To support his contention, Respondent cited Dr. Manoukian's testimony and the spread pattern test conducted by Ah Mow to establish that "[Decedent] was past [Petitioner forty] feet down the driveway or more when he got shot."

### C.

Prior to closing arguments, the court issued the following jury instructions regarding expert testimony:

> During the trial, you heard the testimony of one or more witnesses who are [sic] allowed to give opinion testimony.
>
> Training and experience may make a person <u>qualified to give opinion testimony</u> in a particular field. The law allows that person to state an opinion <u>about matters in that field</u>. Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. It is up to you to decide whether to accept this testimony and how much weight to give it. You must also decide whether the

witness's opinions were based on sound reasons, judgment, and information.

(Emphases added).

### II.

Petitioner maintains that the testimonies of Dr. Manoukian and Ah Mow were improperly admitted, because the witnesses were neither designated as lay witnesses under Hawaiʻi Rules of Evidence (HRE) Rule 701[7] nor as expert witnesses under HRE Rule 702. He argues first that the admission of these testimonies into evidence "violated both HRE Rules 701 and 702, because [the witnesses] were both proffered as lay opinion witnesses," and a modified jury instruction "substituting the [term] 'opinion testimony' for the word 'expert,' makes clear, that the trial court viewed [the witnesses] as lay opinion rather than expert witnesses."

Second, Petitioner suggests that Respondent failed to qualify the two witnesses as expert witnesses under HRE 702, because "although both witnesses may have been 'qualified ... as evidenced by their testimony on direct examination[,]'" (quoting *State v. Metcalfe*, No. 30158, 2012 WL 1071503, at *4 (App. Mar. 30, 2012)), there was "no determination of the fields in which these witnesses would be considered experts and hence no guidance to the jury on the parameters for considering such testimony."

Respondent replies that "both [witnesses are] qualified by their knowledge, skill, experience, training, or education, as evidenced by their testimony on direct examination." (Quoting *Metcalfe*, 2012 WL 1071503, at *8–9.) Also, Respondent argues that it did not proffer the witnesses as experts by identifying them as "experts" at trial because "[t]he trend around the country and in Hawaiʻi County is to avoid the use of the term 'expert.' ... The use of the term 'expert' is rapidly disappearing in many courts around the country." Finally, before the Intermediate Court of Appeals (ICA), Respondent further argued that by failing to object to the

---

7. HRE Rule 701 provides:
 **Rule 701 Opinion Testimony by Lay Witnesses.**
 <u>If the witness is not testifying as an expert</u>, the witness' testimony in the form of opinions or inferences is limited to those opinions or infer-

ences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
(Emphasis added.)

testimony or seeking to voir dire the witnesses, Petitioner had "waived [the issue] unless the court committed plain error."

## III.

Neither Dr. Manoukian nor Ah Mow were qualified to give expert testimony regarding the circumstances of Decedent being shot by Petitioner. Both witnesses were experts in a particular field. Dr. Manoukian was an expert in the field of forensic pathology, and Ah Mow was an expert in the field of firearms training. However, neither possessed expertise in the relevant field—that of ballistics—to render an expert opinion on the various scenarios offered at trial as to how Decedent came to be fatally wounded. Petitioner cited to *State v. Torres*, 122 Hawai'i 2, 28–31, 222 P.3d 409, 435–438 (App.2009) (hereinafter *Torres*), in which the ICA vacated a murder conviction because testimony stating that a gun retrieved from the defendant's car "had been recently fired" was improperly admitted. Specifically, the ICA held that only an expert could have testified that the gun had been recently fired, and the federal agent who rendered that opinion was not an expert. *Id.* at 31, 222 P.3d at 438. In *Torres*, the agent had twenty-five years of experience as a criminal investigator with the Naval Criminal Investigative Service and the United States Navy and significant experience and training in the use and maintenance of firearms. *Id.* However, the agent acknowledged that he had never before testified as a firearms expert or rendered an opinion on whether a firearm had been recently fired, he did not have extensive training in the forensic arts, and he had not done laboratory work examining firearms or obtained special schooling in the analysis of firearms discharges. *Id.* Moreover, the agent admitted that he was "not an expert." *Id.* The ICA concluded that the State did not meet the foundational requirements under HRE Rule 702 for qualifying the agent to render an opinion on whether or not the gun had been recently fired. *Id.* at 31, 222 P.3d at 438.

## A.

Despite Dr. Manoukian's admission that he was not a firearms or ballistics expert, he was permitted to give testimony on the probable distance between Petitioner's gun and Decedent, which he determined to be approximately sixty feet. This distance was a pivotal fact in determining whether Petitioner acted in self-defense. As in *Torres*, Dr. Manoukian did not indicate whether he had previously testified as a ballistics expert or rendered an opinion on the probable distance between a weapon and a victim. His testimony suggested that he had minimal training in the field of ballistics—he had attended "some classes" at the Maryland State Crime Lab. He did not identify himself as a ballistics expert or one qualified to give an opinion on the distance between the firearm and Decedent under the possible scenarios presented regarding the shooting. Dr. Manoukian testified that his field of expertise, forensic pathology, covered "the study of human tissues and human fluids [to determine] how someone was injured or how [ ] [he or she] died." Dr. Manoukian's testimony regarding the distance between Petitioner and Decedent under the circumstances presented by this case, however, did not rely on either an analysis of human tissues or fluids.

The majority argues that although Dr. Manoukian conceded that he was "not a ballistics" expert, this case is distinguishable from *Torres*, 122 Hawai'i at 31, 222 P.3d at 438, because Dr. Manoukian had "observed in excess of a hundred cases in which the cause of death was injury caused by a firearm." Majority opinion at 229, 297 P.3d at 1085. However, performing autopsies where the cause of death was "injury caused by a firearm" would not qualify Dr. Manoukian to testify as to the competing scenarios of the shooting raised by the evidence at trial. The record does not indicate that such questions were present in any of Dr. Manoukian's other autopsies. Thus, the number of autopsies in which a firearm was involved does not establish that he was qualified to testify about the circumstances presented in the instant case.

The majority also distinguishes this case from *Torres* because Dr. Manoukian had "received ballistic and firearm related autopsy training." *Id.* However, the record does not demonstrate that Dr. Manoukian received "ballistic and firearm related autopsy" training, but that he "attended classes" at the Maryland State Crime Lab, where, *inter*

*alia*, he had "some specialized training in [ ] ballistics." Receiving a minimal amount of training in a field does not qualify a witness as an expert—the training must be sufficient to allow the witness to gain expertise. *See Taylor Pipeline Construction, Inc. v. Directional Road Boring, Inc.*, 438 F.Supp.2d 696, 706 (E.D.Tex.2006) (holding that a witness was not qualified as an expert although he "attended four, two-day construction law seminars over the course of his career"). Given that Dr. Manoukian specifically testified that he was "not a firearms or a ballistics expert," it appears that he himself acknowledged his lack of expertise in those fields.

Finally, the majority contends that Dr. Manoukian stated that the formula used to determine the distance from the shotgun to the target was "taken from textbooks of forensic pathology," majority opinion at 229, 297 P.3d at 1085, demonstrating that Dr. Manoukian could determine "the approximate distance of [Decedent] from the shotgun at the time it was fired." Majority opinion at ——–——, 297 P.3d at 1085 (internal citations and punctuation omitted). Pursuant to HRE Rule 703,[8] however, opinions may be based on facts not in evidence (such as textbooks) only if those facts are "of a type reasonably relied upon by experts in the particular field." HRE Rule 703. Here, Dr. Manoukian did not testify that experts in his field commonly rely on the formula he cited or the textbook he examined. Therefore, a proper foundation for the introduction of the formula Dr. Manoukian testified to was not laid. Since Respondent failed to establish the necessary foundation for Dr. Manoukian to provide an opinion on this issue under HRE Rule 702, his testimony on that subject must be treated as that of a lay-witness under HRE Rule 701. However, such testimony in the area of ballistics would exceed the common knowledge of a lay person, and thus Dr. Manoukian's resulting opinion testimony was improper lay testimony and so inadmissible under HRE Rule 701.

### B.

Additionally, Respondent did not establish that Ah Mow was qualified to give testimony on the circumstances of the shooting. Although Ah Mow testified that he was a firearms instructor, he did not indicate whether he had testified as a firearms expert or rendered an opinion on the probable distance between a weapon and a victim before. His testimony suggested that he had not had training in forensics, done laboratory work examining firearms, or obtained special schooling in the analysis of firearms discharges. He did not identify himself as a ballistics expert or one qualified to give an opinion on the distance between the firearm and Decedent under the different circumstances portrayed of the shooting, and neither Respondent nor the court qualified him as such.

The majority argues that this case is distinguishable from *Torres* because "here, the test that [Ah Mow] performed did not involve specialized technical expertise beyond the scope of his knowledge concerning the operation of shotguns." Majority opinion at 229, 297 P.3d at 1085. Ah Mow testified that he had received training in "handling," "basic field stripping," and "maintaining and cleaning" shotguns. His background provided no basis for discerning whether the spread pattern test was a "scientific test,"[9] *see Torres*,

---

8. HRE Rule 703 provides:

> **Rule 703 Bases of Opinion Testimony by Experts.**
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. <u>If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.</u> The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.
> (Emphasis added.)

9. The majority maintains that *Torres* does not require an expert to use a "scientific test." Majority opinion at 229 n. 17, 297 P.3d at 1085 n. 17. In *Torres*, the investigator testified that he believed that a gun was probably fired eight hours before he examined it, based on "the moistness of the gunpowder residue and the absence of rust in the gun." 122 Hawai'i at 27, 222 P.3d at 434. However, he was not aware of a "scientific test" to determine when a gun was fired, and the court had "not been cited any authority verifying that the observations made by Agent Robbins would provide a reliable basis for determining the time frame in which a gun had previously been fired." *Id.* at 31, 222 P.3d at 438. Similarly, in the instant case, Ah Mow

122 Hawai'i at 28, 222 P.3d at 435, which was what Ah Mow implied when he testified that the spread pattern "measures the distance between the muzzle and the target." This determination required expertise not in the field of firearms, but in the field of ballistics. Although a firearms expert could recognize, for example, that the weapon was properly functioning at the time of the test performed by Ah Mow, only a ballistics expert could establish whether or not results from the test retained external validity when transferred to the crime scene.[10]

Indeed, Ah Mow's testimony went beyond that of the use and operation of firearms.[11] Nothing in Ah Mow's testimony suggested

that he was qualified to testify as a ballistics expert or to determine whether the test was "scientific." Due to his lack of expertise, Ah Mow was not qualified to give an opinion in the field of ballistics, and therefore his testimony lacked foundation under Rule 702.[12] Further, like Dr. Manoukian, such testimony in the area of ballistics would exceed the common knowledge of a lay person, and thus Ah Mow's resulting opinion testimony was improper lay testimony and so inadmissible under HRE Rule 702.

IV.

Moreover, even if Dr. Manoukian and Ah Mow were qualified to give expert testimony

---

lacked the expertise to establish that the spread pattern test constituted a reliable basis for determining the distance at which Petitioner shot Decedent.

10. " 'External validity' considers the question, '[h]ow far are we justified in taking the data, assuming them to be accurate in their own terms, and in drawing implications or conclusions in other contexts either very closely related ... or much further away?' " *Tuli v. Brigham & Women's Hospital, Inc.,* 592 F.Supp.2d. 208, 215 n. 6 (D.Mass.2009) (citations omitted); *see also United States v. Purvis,* 2010 WL 1816336 at *2 (D.Kan. May 4, 2010) (noting that the "external validity" of a test indicates whether the results of that test can be "carried over into the real world").

11. Ironically, in its brief and at oral argument, Respondent itself questioned Ah Mow's expertise in the field of ballistics, maintaining that at least part of Ah Mow's trial testimony—his assertion that "moving the barrel of shotgun while discharging it could cause a distortion of the shot pattern"—was inaccurate. Respondent argued in its Response that this was "an enduring myth about shotguns." Accordingly, Ah Mow was allowed to render an opinion for the jury despite the fact that Respondent maintains that he was unqualified to do so in part.

12. The majority contends that Ah Mow "did not testify to the ultimate issue in this case, i.e., that he did not conclude at what distance [Petitioner] shot [Decedent]." Majority opinion at 230 n. 17, 297 P.3d at 1086 n. 17. Instead, according to the majority, Ah Mow "testified only that he conducted a test, which involved firing a shotgun under 'ideal laboratory conditions' at eight targets placed at various distances." *Id.* Respectfully, this misconstrues the palpable prosecutorial purpose of Ah Mow's testimony.

Ah Mow's testimony indicated that the distances calculated by the spread pattern test were

transferrable to the crime scene. When police examined the crime scene, they recovered two shotgun shells and a hacksaw. The two shotgun shells were 47.8 and 51.1 feet from the hacksaw, respectively. Ah Mow testified that he included these distances of 47.8 feet and 51.1 feet in the spread pattern test to "show the distance between the spent shotgun shell[s] and the [ ] hacksaw." Therefore, Ah Mow's testimony indicated that the spread pattern results could be applied to the crime scene in the instant case.

Moreover, if the test conducted by Ah Mow did not apply to the distance at which Petitioner shot Decedent, that test would have been irrelevant, and inadmissible under HRE Rule 402, which provides that "[e]vidence which is not relevant is not admissible." The majority appears to acknowledge that Ah Mow's testimony was introduced "to rebut [Petitioner's] theory of self defense." Majority opinion at 227 n. 15, 297 P.3d at 1083 n. 15. The record demonstrates that the only way in which Ah Mow's testimony could have rebutted Petitioner's theory of self-defense was by establishing the distance at which Petitioner shot Decedent. Indeed, in closing argument, Respondent cited Ah Mow's testimony as evidence that Petitioner was forty feet away from Decedent when shots were fired.

The majority argues that the prosecutor in closing argument is permitted to draw reasonable inferences from the evidence, *see* majority opinion at 229 n. 17, 297 P.3d at 1085 n. 17, thus seemingly conceding that Ah Mow's testimony was used to address the ultimate issue of distance between Petitioner and Decedent at the time of the shooting. Indeed, Respondent used Ah Mow's testimony to draw an "inference" regarding the distance between Petitioner and Decedent for the jury. This demonstrates that the purpose of Ah Mow's testimony was to address the "ultimate issue" in the case. The majority's position is thus contradicted by the record. Accordingly, Respondent was permitted to argue these matters before the jury even though Ah Mow was unqualified to testify as to the distance

in the field of ballistics, admitting the testimonies of these witnesses into evidence without establishing on the record and for the jury that they were qualified to render an "expert" opinion and to do so in a specific field was plain error.[13]

### A.

Pursuant to Rule 104(a), "[p]reliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court." (emphasis added). Whether "[e]xpert testimony is admissible under [HRE Rule] 702" is "governed by Rule 104(a)." Addison M. Bowman, *Hawai'i Rules of Evidence Manual* § 104–1. Hence, in the instant case, the court was required to determine whether Dr. Manoukian and Ah Mow were qualified to testify as experts.

Under the HRE, witnesses who give testimony in the form of an opinion fall into one of two categories. All witnesses may testify as to their opinions if the testimony is "(1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." HRE Rule 701. However, if the jury requires "scientific, technical, or other specialized knowledge" to "understand the evidence or determine a fact in issue," only a "witness qualified as an expert by knowledge, skill, experience, training, or education" may provide the required opinion testimony. HRE Rule 702; *see also Nielsen v. American Honda Motor Co.*, 92 Hawai'i 180, 188, 989 P.2d 264, 272 (App. 1999) ("[A] witness may qualify as an expert if he or she possesses a background in any one of the five areas listed under HRE Rule 702: knowledge, skill, experience, training, or education."). However, the HRE clearly contemplate that the experts will have a specific field of expertise, and limit their opinion testimony to matters within that field. *See* Commentary to HRE Rule 702 (" 'The determination of whether or not a witness is qualified as an expert in a particular field is largely within the discretion of the trial judge.' ") (quoting *State v. Torres*, 60 Haw. 271, 277, 589 P.2d 83, 87 (1978) (emphasis added)); *cf. State v. Vliet*, 95 Hawai'i 94, 111, 19 P.3d 42, 49 (2001) ("[T]he trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.") (emphasis added).

Hence, according to the HRE, the trial court retains the ultimate responsibility to qualify experts and to establish their fields of expertise. The determination that a witness is qualified must be made on the record and for the jury, because a "determination by the court that a witness qualifies as an expert is binding on the trier of fact." Commentary to HRE Rule 702 (emphasis added).[14] Without a determination on the record that a witness is qualified to give opinion testimony, the jury cannot know that the witness' status as an expert is binding on it. Unless this initial decision by the court is made known to the jury, the jury will not know what testimony it is bound to consider as opinion testimony. Hence, the qualifications of an expert must be established so the jury may properly perform its function in evaluating the expert's testimony.

---

between Petitioner and Decedent at the time of the shooting.

**13.** The majority argues that "nothing in the HRE would preclude the trial court from declining to qualify as a witness as an expert in front the jury, so long as the requisite foundation for the witness's testimony is established." Majority opinion at 226, 297 P.3d at 1082. According to the majority, "[t]he plain language of HRE Rule 702 ... does not indicate that the trial court must formally qualify a witness as an expert in front of the jury before the witness's testimony can properly be admitted." *Id.* at 225, 297 P.3d at 1081. However, as discussed *infra*, the court must qualify an expert for the jury so that the jury may "consider the qualifications of the witness in determining the weight to be given to his testimony." Commentary to HRE Rule 702.

**14.** The majority also cites HRE Rule 1102 in support of its argument that "nothing in the HRE would preclude the trial court from declining to qualify a witness an expert in front of the jury, so long as the requisite foundation for the witness's testimony is established." Majority opinion at 226, 297 P.3d at 1082. HRE Rule 1102 provides that "[t]he court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses." However, informing the jury that a witness is qualified to testify does not amount to commentary on any specific piece of evidence or on the credibility of the expert. The purpose of qualification is to inform the jury that the witness may provide testimony which must be considered as evidence.

Once expert testimony is admitted by the court and "is binding on the trier of fact," the jury may "consider the qualifications of the witness in determining the weight to be given to his [or her] testimony." Commentary to HRE Rule 702. Consequently, if the judge does not establish, on the record or in instructions to the jury, that a witness's qualifications entitle him or her to give opinion testimony, the jury cannot know that it may "consider the qualifications of the witness in determining the weight to [ ] give[ ]" to the witness's testimony, as contemplated by Rule 702. Commentary to HRE Rule 702.[15]

In the opinion testimony instruction, the jury was told that "[i]t is up to you to decide whether to accept this testimony [of expert witnesses] and how much weight to give it." Respectfully, because the court did not make a determination on the record regarding the qualifications of Dr. Manoukian and Ah Mow, or issue instructions with respect to the qualifications of these witnesses, the jury could not know which qualifications to consider when following the court's instruction and in determining the weight to assign to the two witnesses' testimony.[16]

**B.**

To reiterate, the court must also establish for the jury the field in which the witness possesses expertise. As discussed *supra*, experts must limit the opinion testimony they provide as experts to their field of expertise. *See Vliet*, 95 Hawai'i at 111, 19 P.3d at 49 ("[T]he trial judge must determine whether the testimony has a reliable basis in the knowledge and experience <u>of the relevant discipline</u>.") (emphasis added); *Yap v. Controlled Parasailing of Honolulu, Inc.*, 76 Hawai'i 248, 253, 873 P.2d 1321, 1326 (1994) ("Initially, it is for the circuit court to decide whether an expert witness has such skill, knowledge, or experience <u>in the field in question</u> such that his or her opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.") (emphasis added); *Larsen v. State Savings and Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982) ("[T]he expert witness must have such skill, knowledge, or experience <u>in the field in question</u>.")(emphasis added). If the judge does not state, on the record and for the jury, an expert's field of expertise, then the jury cannot determine what testimony is relevant to

---

15. The majority maintains that "the commentary to HRE Rule 702 does not require the court to state in front of the jury that an individual is an expert in a particular field." Majority opinion at 225 n. 10, 297 P.3d at 1081 n. 10. To the contrary, it should be evident that the court must so instruct the jury orally or in written instructions, for, as pointed out *supra*, if the court does not inform the jury that a witness is qualified to give an opinion in a particular field, the jury will be unable to weigh the testimony of an expert or opinion witness as envisioned by the commentary. Thus, inhering in the commentary is the requirement that the court communicate to the jury that an opinion witness is qualified in the relevant field so as to render an appropriate opinion.

The majority also asserts that under its approach, a party offering an expert witness is required to establish "the requisite foundation for the witness's testimony," i.e., the party offering an expert witness must establish that he or she is qualified. Majority opinion at 226, 297 P.3d at 1082. The majority contends that such foundational testimony can "assist the jury in determining the weight to be given to the witness's testimony." *Id.* at 227, 297 P.3d at 1083. Respectfully, the jury can only be assisted if the fact of qualification is made known to it, i.e., if the court informs the jury that a witness is qualified to give an opinion in a particular field. The

jury cannot otherwise know that foundational testimony is pertinent to weighing the expert's testimony as intended by the commentary.

16. The majority also argues that "federal courts have held that a court's failure to formally qualify a witness as an expert is harmless error if the record establishes that the witness would have been qualified as an expert under the Federal Rules of Evidence (FRE) Rule 702." Majority opinion at 226 n. 14, 297 P.3d at 1082 n. 14; *see also United States v. Figueroa–Lopez*, 125 F.3d 1241, 1247 (1997) ("[The expert] was qualified to deliver the opinion testimony disputed in this case, and the failure formally to go through the usual [qualification] process—although an error—was clearly harmless.")(emphasis added). But, unlike the FRE, the commentary to HRE Rule 702 states that the jury may "consider the qualifications of the [expert] witness in determining the weight to be given to his testimony." Significantly, the Advisory Committee Note to FRE Rule 702 does not contain similar language. Therefore, as explained *supra*, under the HRE, the failure to qualify an expert on the record or via instructions and to do so with respect to a relevant field is not harmless because the jury would otherwise be prevented from carrying out its assigned function. Additionally, as noted herein, the error was not harmless.

the disputed issues. *See* Commentary to Rule 702.

The problem faced by juries when the court fails to determine, on the record, an expert's field of expertise are accentuated in cases such as the instant case where expert witnesses provide testimony in multiple fields. In such cases, qualifications are meaningless without context, because the jury must know which qualifications are relevant to establishing expertise with respect to the several fields in which an expert may be deemed to have testified. If the court does not clearly delineate the fields in which a witness possesses expertise, the jury cannot relate the witnesses' qualifications to the relevant issues at trial. *See* Commentary to Rule 702 ("The trier of fact may nonetheless consider the qualifications of the witness in determining the weight to be given to his testimony.")

### C.

As noted, here the jury was instructed [17] that "[t]raining and experience may make a person qualified to give opinion testimony in a particular field. The law allows that person to state an opinion about matters in that field." However, the court did not establish the "particular field" in which Dr. Manoukian and Ah Mow were deemed to be experts or whether such fields encompassed expertise in determining the distance between the firearm discharged and a victim under the circumstances of this case. Both Dr. Manoukian and Ah Mow were allowed to testify outside of their fields of expertise.

In the case of Dr. Manoukian, for example, it is possible that the jury used the testimony establishing Dr. Manoukian's expertise in the field of forensic pathology, and not ballistics, when ascertaining the weight to attach to his testimony. The same possibility exists regarding Ah Mow's testimony—the jury may have weighed his testimony based on his qualifications in the field of firearms, and not in the field of ballistics.

Hence, the jury was without necessary guidance as to the fields of expertise relevant to encompass the distance issue and whether

these witnesses were qualified in those fields. It is possible that the jury assigned equal weight to both witnesses's testimony or substantial weight to Dr. Manoukian's testimony. Without the aforesaid guidance, a juror would not know what training or expertise was appropriate to qualify a witness to render an opinion about the shooting. Consequently, the jury did not have a sufficient basis for accepting or rejecting the opinions or for determining the weight to assign the opinions of the witnesses.

### D.

Respondent maintains that Petitioner challenges the replacement of the term "expert" in the jury instructions, and cites in response, the proposal of Judge Charles Richey, that advocates the replacing the term "expert" with the term "opinion witness" in court proceedings. *See* Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules Of Evidence in Civil and Criminal Trials*, 154 F.R.D. 537, 541 (1994) (hereinafter Richey, *Use of the Word "Expert"*) (arguing that "any reference to 'expert witness' " should be deleted from the Federal Rules of Evidence and replaced with "opinion witness" to diminish the "aura of special reliability" that juries attach to experts). Similarly, the majority contends that the instructions, which "substitut[ed] the words 'opinion testimony' for the word 'expert,' . . . accurately stated the law." Majority opinion at 230, 297 P.3d at 1086. In my view, there is no error when the jury instructions refer to an expert qualified to render an opinion under Rule 702 as an "opinion witness," rather than an "expert."

The majority, however, also cites Judge Richey's proposal as support for its position that its was not error for the court to "declin[e] to qualify a witness as an expert in front of the jury." Majority opinion at 226, 297 P.3d at 1082. To the contrary, Judge Richey's proposal does not eliminate the necessity of establishing for the jury the qualifications of an opinion witness and the field in which that witness possesses expertise.[18] Instead, Judge Richey endorsed further judi-

---

17. Respondent notes in its Response to Petitioner's Application that Petitioner "did not object to [this jury instruction] at trial."

18. The concern of Judge Richey and the other authorities cited by the majority appears limited to the use of the term "expert witness." Richey, *Use of the Word "Expert"* at 541 ("The use of the

cial supervision over opinion witnesses through mechanisms such as pre-trial hearings to determine the admissibility of opinion testimony (and to place such findings on the record). *See* Richey, *Use of the Word "Expert"* at 551 ("[T]he bench and bar should insist on the bases and reasons for opinion testimony in advance of trial—in addition to the witness' qualifications."). Judge Richey also noted that "trial courts <u>must emphasize by way of limiting instructions</u> that it is solely within the province of the jury to accept or reject opinion testimony and to give it such weight as they deem appropriate in light of the evidence presented." *Id.* at 555 (emphasis added). Thus, Judge Richey's proposal recognizes that irrespective of whether the court uses the term "expert," the jury requires further guidance to properly evaluate the testimony of opinion witnesses.[19]

Consequently, regardless of whether the testimony is termed "expert" testimony or

"opinion" testimony, the presiding judge must still make a ruling on whether a witness is qualified to testify in a particular field. To reiterate, this ruling is a legal determination that is binding on the trier of fact. *See* Commentary to HRE Rule 702 ("Determination by the court that a witness qualifies as an expert is binding upon the trier of fact.") The contemplation of Rule 702 is that the jury will weigh the testimony of the expert based on the qualifications of that expert. *See id.* ("The trier of fact may nonetheless consider the qualifications of the witness in determining the weight to be given to his testimony."). However, jurors will be unable to consider the witnesses' qualification if they are unaware that the witness is qualified and in what field.

Respectfully, in the instant case, it does not appear that the court exerted supervision over the experts' testimony by qualifying them as opinion witnesses and designating their area of expertise for the jury. As

term 'expert witness' in civil and criminal jury trials is prejudicial.") (emphasis added); *see also* 1 *McCormick on Evidence*, § 13, at 69 n.14 (noting that by "accept[ing] the witness <u>as an expert in a particular field</u>," a judge "increases the witness's credibility in the jurors' eyes.") (emphasis added); *Barbee v. Queen's Medical Center*, 119 Hawai'i 136, 154, n. 12, 194 P.3d 1098, 1116 n. 12 (App.2008) (citing authorities which state that "<u>when a court certifies that a witness is an expert</u>," it "inordinately enhances the witness's stature"); *People v. Lamont*, 21 A.D.3d 1129, 1132, 800 N.Y.S.2d 480 (N.Y.App.Div.2005) (noting that "<u>explicitly declar[ing] a witness an expert</u>" may "improperly bolster[] the witness" and "grant the witness the imprimatur of the court") (emphasis added). These authorities do not address the necessity of explaining to the jury that an opinion witness is qualified to render an opinion and to do so in the field in which he or she is allowed to testify, so that the jury can appropriately weigh the testimony of that witness as required by the commentary to HRE Rule 702. Obviously, referring to such a witness as an opinion witness rather than as an expert has nothing to do with properly instructing a jury on evaluating that witness's testimony.

19. Contrary to the position of the majority, we do not "impl[y] that Judge Richey's procedure requires the court to make a finding in front of the jury that an individual was qualified to render an opinion in a particular field." Majority opinion at 226 n. 11, 297 P.3d at 1082 n. 11. Instead, Judge Richey's article emphasizes the need for the jury to be properly guided in the evaluation of such testimony—the point made herein.

Thus, Judge Richey advocated the use of limiting instructions to inform the jury that witnesses may testify in the form of an opinion when they "have acquired a certain specialized knowledge in some art, science, profession, or calling, to state an opinion as to relevant and material matters." Richey, *Use of the Word "Expert"*, at 562. The limiting instruction proposed by Judge Richey then states that when weighing the testimony of opinion witnesses, the jury may "<u>consider qualifications</u>, opinions and reasons for testifying, as well as all other considerations that apply when you evaluate the credibility of any witness." *Id.* (emphasis added). If the court failed to explain to the jury which witnesses were qualified to testify as opinion witnesses, and did not establish the "art, science, profession, or calling" in which the witness possessed specialized knowledge, then the jury would be unaware of which witnesses were covered by the opinion testimony instruction.

Moreover, Judge Richey also proposed several other devices for exercising control over expert testimony, such as utilizing motions in limine to determine the admissibility of opinion testimony, holding pre-trial conferences and hearings, directing a court-appointed expert to examine scientific evidence, and employing more rigorous cautionary instructions when an expert witness also testifies as a fact witness. *Id.* at 549–551. These proposals all suggest concerns regarding the ability of the jury to properly evaluate expert testimony. Therefore, they reinforce the necessity of providing guidance to the jury, which is consistent with the position of this dissent.

discussed *supra*, without such information the jury cannot adequately evaluate an "expert's" testimony, whether the witnesses are designated as "experts" or as "opinion witnesses." Therefore, Dr. Manoukian's and Ah Mow's testimonies were not properly admitted.

## V.

Respondent argues that it was a "legitimate trial tactic" for Petitioner not to object to the qualifications of the two expert witnesses. According to Respondent, there were strategic reasons for Petitioner to avoid a determination by the court that Dr. Manoukian and Ah Mow were qualified as experts in a particular field. Contrary to Respondent's position, the Petitioner's "strategic decision," if it existed, to keep the jury from hearing the qualifications of an expert witness had no bearing on the court's obligation to enforce HRE Rule 702. Pursuant to HRE Rule 104(a), irrespective of any party's strategy, the determination of whether an expert is qualified is assigned to the court. *See* HRE Rule 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court."). It is the court's finding, and not the parties' strategy, that allows opinion evidence to be admitted pursuant to HRE Rule 702. Rule 702 specifically directs the court to determine whether or not an expert will be of assistance to the jury and whether a witness is qualified to testify and to do so in what area.

Further, regardless of strategy, the court must make a finding on the record stating whether a witness is qualified and in what area so that the jury can preform its assigned function. *See* Commentary to HRE 702. It is "the trial courts, not the parties, [that] have the duty and ultimate responsibility to insure that juries are properly instructed." *State v. Haanio*, 94 Hawai'i 405, 415, 16 P.3d 246, 256 (2001); *see also State v. Nichols*, 111 Hawai'i 327, 335–36 141 P.3d 974, 982–83 (2006) ("The duty to instruct the jury ultimately lies with the trial court."). This duty is based on a recognition that if considerations of strategy preclude the court from properly instructing the jury, the "truth

seeking function of the judicial system" is impaired. *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256.

Additionally, the court's failure to make findings on the record regarding the expert's qualifications also prevents appellate courts from performing their function. If the court does not explain, on the record, its basis for permitting expert testimony, then "an appellate court cannot reasonably infer that the trial court has considered" the expert's qualifications and made a determination that the expert is in fact qualified. *Cf. State v. Tierney*, 127 Hawai'i 157, 171, 277 P.3d 251, 265 (2012) (holding that the court abused its discretion by failing determine, on the record, whether or not a defendant's refusal to cooperate with a mental examiner was the product of a physical or mental defect, as was required by statute). Appellate review is also hampered if the court fails to establish, on the record, the witness's field of expertise. If an appellate court does not know the field in which the court believed the expert to be qualified, it cannot determine whether individual statements by a witness fell within that field.

## VI.

### A.

Respondent relied on the testimonies of Dr. Manoukian and Ah Mow to rebut Petitioner's self-defense argument. In closing argument, Respondent maintained that "[i]t's not self-defense," because, *inter alia*, "[decedent] was shot in the back at least forty feet away from [Petitioner]." (Emphasis added.) Respondent justified this assertion by referring to the testimonies of Dr. Manoukian and Ah Mow. Respondent first reminded the jury that "the general range estimate of how far away the shooter would have been" given by Dr. Manoukian was "approximately [sixty] feet." Further, Respondent cited the spread pattern test conducted by Ah Mow to establish that "[Decedent] was past him [forty] feet down the driveway or more when he got shot." Because of Respondent's reliance on the testimony provided by Dr. Manoukian and Ah Mow to discredit Petitioner's assertion of self-defense, it cannot be said that the court's error in admitting the testimonies of Dr. Manoukian and Ah Mow was harmless,[20]

20. The majority appears to assert that even if the

Dr. Manoukian's testimony and Ah Mow's testi-

and hence there is a reasonable possibility the erroneous admission of their testimonies contributed to Petitioner's conviction.[21] *See Torres*, 122 Hawai'i at 32, 222 P.3d at 439. The error in admitting such testimony plainly deprived Petitioner of his substantial right to a fair trial and thus constituted plain error. *See State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986) (holding that error affecting a defendant's right to a fair trial constitutes plain error). Hence, this court may notice such error even though Petitioner's trial counsel failed to object to this error. *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 75 (1993) ("[W]here plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court."); *see also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

## B.

The majority argues that although "[Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) ] provides that plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court," majority opinion at 225, 297 P.3d at 1081, "objections to the admission of incompetent evidence, which a party failed to raise at trial, are generally not subject to plain error review." *Id.* However, we have held that "this court may notice errors affecting a defendant's substantial rights" regardless of whether an objection was raised at trial, "even where the error may be related to the admissibility of evidence." *State v. Schnabel*, 127 Hawai'i 432, 461, 279 P.3d 1237, 1266 (2012); *see also* HRE Rule 103(a) ("Nothing in this rule [requiring the parties to object to improperly admitted evidence] precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.").[22]

mony should not have been admitted, the admission of that testimony was harmless. Majority opinion at 230, 297 P.3d at 1086. The majority states that because "the appearance of gunshot wounds only on [Decedent's] back substantially undermined [Petitioner's] theory of self-defense," it is "unclear what effect these witnesses' testimony with regard to distance may have had." *Id.* This directly contradicts the record, Respondent's theory as advanced in its case, and Respondent's closing argument.

As explained *supra*, the parties put forward two different theories of the events leading to Decedent's shooting. Dr. Manoukian's testimony and Ah Mow's testimony were crucial in advancing Respondent's theory, namely, that Petitioner shot Decedent in the back, from a distance of forty feet or more. Because the Dr. Manoukian's testimony and Ah Mow's testimony played a pivotal role in supporting Respondent's theory, it cannot be said that the improper admission of their testimony was harmless. The jury would be substantially hampered in making a proper evaluation of these competing views if not properly instructed, as indicated *supra*.

21. The majority's contention that the erroneous admission of evidence may have been harmless is based on its assertion that "the appearance of gunshot wounds only on [Decedent's] back sub-stantially undermined [Petitioner's] theory of self-defense." Majority opinion at 230, 297 P.3d at 1086 (emphasis added). Given that there were two competing theories of how Decedent came to be shot in the back, it was the primary responsibility of the jury, and not we as appellate judges, to decide the evidence as to either theory. *Cf. State v. Kikuta*, 125 Hawai'i 78, 89, 253 P.3d

639, 650 (2011) (holding that "an assessment of the credibility of the witnesses and a weighing of the evidence" is "not within the province of an appellate court, but a function of the fact finder at trial"). Respectfully, it is not the role of this court to independently assess the evidence and endorse one theory over the other. Only the jury could resolve what actually occurred, but the jury could do so only if it was properly instructed.

22. The majority argues that *Schnabel* is distinguishable from the instant case because "the evidentiary errors at issue in *Schnabel* implicated the defendant's right to testify." Majority opinion at 225 n. 9, 297 P.3d at 1081 n. 9. However, in *Schnabel* this court did not limit its ruling to circumstances where the right to testify was at issue. To the contrary, this court held that "plain error review <u>does apply to erroneous evidentiary rulings that affect a defendant's substantial rights.</u>" 127 Hawai'i at 462, 279 P.3d at 1267 (emphasis added). Similarly, although the majority cites *State v. Fields*, 115 Hawai'i 503, 528, 168 P.3d 955, 980 (2007), *Fields* declined to notice plain error because the defendant "ha[d] failed to demonstrate that <u>his substantial rights have been adversely affected.</u>" *Id.* (emphasis added).

Moreover, *Schnabel* cited *Cummings*, which held that "[e]rroneous admission of evidence may constitute plain error if a fair trial of the accused was thereby impaired." 49 Haw. at 528, 423 P.2d at 442; *see also State v. Estrada*, 69 Haw. 204, 221, 738 P.2d 812, 824 (1987) (holding that improper admission of evidence

Further, *Schnabel* rejected the proposition that the cases cited by the majority, *State v. Wallace*, 80 Hawai'i 382, 910 P.2d 695 (1996), and *State v. Uyesugi*, 100 Hawai'i 442, 60 P.3d 843 (2002), indicate that evidentiary errors are "generally not subject to plain error review." *Schnabel*, 127 Hawai'i at 462, 279 P.3d at 1267 n. 67. Rather, "under the facts and circumstances" of those cases, "the defendant's substantial rights were not affected, and therefore plain error did not apply." *Id.* at 462, 279 P.3d at 1267. *Wallace*, for example, stated that evidentiary errors will be considered under HRPP 52(b) if "the ends of justice require it, and fundamental rights would otherwise be denied." 80 Hawai'i at 410, 910 P.2d at 723 (citing HRPP 52(b) (other citations omitted)).[23] *Wallace* then concluded that "we find no such justification here." *Id.* (citations omitted). Similarly, *State v. Uyesugi* did not contain a blanket suggestion that plain error does not apply to evidentiary questions. In its brief discussion of an error not objected to by the defendant, it merely refused to find plain error given the specific facts presented. 100 Hawai'i 442, 462, 60 P.3d 843, 863 (2002). None of our cases propose a bar to noticing plain error because the error is an evidentiary one.[24] Thus, the introduction of the testimony of Dr. Manoukian and Ah Mow constituted plain error.

---

constituted plain error because the defendant's "substantial due process rights to a fair trial [were] implicated"). As pointed out *supra*, in this case the admission of Dr. Manoukian's testimony and Ah Mow's testimony deprived Petitioner of his right to a fair trial, and therefore "affect[ed] Petitioners'] substantial rights." *Schnabel*, 127 Hawai'i at 462, 279 P.3d at 1267.

Finally, the majority contends that in *Schnabel*, a majority of this court relied upon judicial notice in making its determination to vacate "the conviction," and "referenced plain error only as an alternative argument." Majority opinion at 225 n. 9, 297 P.3d at 1081 n. 9. In *Schnabel*, this court stated that "alternatively, we also conclude that the court's failure to apply HRS § 571–84(h) was plain error." 127 Hawai'i at 447, 279 P.3d at 1252 (emphasis added). Therefore, *Schnabel* clearly "concluded" that plain error applied.

23. Because *Wallace* cited HRPP 52(b) for this proposition, it implicitly held that its formulation of the rule was equivalent to the language in HRPP 52(b) stating that plain errors "affecting substantial rights may be noticed."

---

## VII.

For the reasons set forth herein, I would vacate Petitioner's conviction and remand for a new trial.

---

24. *Schnabel* cited other Hawai'i cases that have noticed plain error based on erroneous evidentiary rulings. 127 Hawai'i at 461–62, 279 P.3d at 1266–67. *See, e.g., State v. Domingo*, 69 Haw. 68, 733 P.2d 690, 692 (1987) ("[S]ince the introduction of the evidence in question was prohibited by statute, it constituted plain error and is noticeable by this court."); *State v. Pastushin*, 58 Haw. 299, 302, 568 P.2d 504, 506 (1977) ("[W]here inadmissible hearsay is so prejudicial as to deprive the defendant of his constitutional right to a fair trial, its admission will constitute ground for reversal, although defense counsel has failed to object."); *State v. Santiago*, 53 Haw. 254, 261, 492 P.2d 657, 662 (1971) (finding plain error because the prosecution's introduction of the defendant's prior convictions to impeach his credibility violated his constitutional right to testify in his own defense); *State v. Cummings*, 49 Haw. 522, 528, 423 P.2d 438, 442 (1967) ("Erroneous admission of evidence may constitute plain error if a fair trial of the accused was thereby impaired, or if it substantially prejudiced the accused.").